650 F.2d 430
 INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., and,
on Behalf of Themselves and All International Society for
Krishna Consciousness Members, and Alan Attias, a/k/a Aja
Dasa, and Kenneth L. Solomon, a/k/a Kesihanta, Plaintiffs-Appellants,
v.
J. Roger BARBER, in his official capacity as Commissioner of
the Department of Agriculture and Markets of the State of
New York, and Thomas G. Young, Director of the New York
State Industrial Exhibit Authority, and James G. Garlick,
Acting Director of the New York State Industrial Exhibit
Authority, Defendants- Appellees.
 No. 1046, Docket 80-7709.
 United States Court of Appeals,
Second Circuit.
 Argued May 11, 1981.
Decided June 3, 1981.
 
 Robert C. Moest, Los Angeles, Cal. (Larry J. Roberts, David Grosz, Barry A. Fisher Law Offices, Los Angeles, Cal., Faith A. Seidenberg, Seidenberg & Strunk, Syracuse, N.Y., of counsel), for plaintiffs-appellants.
 Thomas J. Maroney, Asst. Atty. Gen., Syracuse, N.Y. (Robert Abrams, Atty. Gen., of the State of New York, Shirley Adelson Siegel, Sol. Gen., George M. Levy, Asst. Atty. Gen., New York City, of counsel), for defendants-appellees J. Roger Barber and Thomas G. Young, as Director of the New York State Fair.
 Bradley J. Carr, Syracuse, N.Y. (Charles R. Welch, Welch, Welch & Carr, Syracuse, N.Y., of counsel), for defendants-appellees James G. Garlick and Thomas G. Young as Manager of the New York State Industrial Exhibit Authority.
 Steven R. Shapiro, New York City (Linda R. Blumkin, Lois Herzeca, New York City, of counsel), as amicus curiae for the New York Civil Liberties Union.
 Before KAUFMAN and OAKES, Circuit Judges, and WERKER, District Judge.*
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 Tolerance of the unorthodox and unpopular is the bellwether of a society's spiritual strength. A community sufficiently confident of its moral and political underpinnings trusts its members to employ reasoned and considered judgment in evaluating novel theories that seek to explain the meaning and purpose of life. The coercive mechanisms of restraint, violence, and suppression are not required to confront strange ideologies and unfamiliar rituals, however obnoxious they may be. This freedom to explore diverse political and religious doctrines, derived from the establishment and free exercise clauses of the First Amendment, permits our citizens to follow the dictates of conscience. By fostering this voluntarism, our nation is strengthened, for the people respect a government that treats its charges as free-willed, discerning moral beings. Our republic prides itself on the enormous diversity of religious and political beliefs which have been able to find acceptance and toleration on our shores. United States v. Seeger, 326 F.2d 846, 853 (2d Cir. 1964), aff'd, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).
 
 
 2
 Our openness is legitimately restricted only when underlying motives of deception and fraud hide behind a facade of conscience and religious belief. First Amendment freedoms ought not be debased by including these practices within their rubric. Courts, recognizing the inherent constitutional difficulties where a secular state questions the good faith of an individual voicing political and religious ideals, require the government to tailor its restraints narrowly. In this case, the State of New York has attempted to prevent fraud at its annual New York State Fair by forbidding peripatetic solicitations. This prohibition effectively prevents the members of an unorthodox Eastern religion, the International Society for Krishna Consciousness (ISKCON, Krishna), from engaging in the religious ritual of sankirtan. This practice requires roving devotees to approach the uninitiated, to inform them of the precepts of the religion, and to seek monetary donations. Notwithstanding evidence that fraud is occasionally involved in the practice of sankirtan, the State has failed to show that methods less restrictive than an outright prohibition are ineffective in checking misconduct. Accordingly, we hold that the State unconstitutionally interfered with the free exercise rights of ISKCON members by enacting and enforcing its anti-solicitation rule.
 
 I.
 
 3
 Courts temporal are not ideally suited to resolve problems that originate in the spiritual realm. But, in determining whether a governmental enactment unreasonably interferes with the free exercise of religion, a threshold inquiry into the "religious" aspect of particular beliefs and practices cannot be avoided. See L. Pfeffer, Church State and Freedom 607 (rev. ed. 1967); Note, Toward a Constitutional Definition of Religion, 91 Harv.L.Rev. 1056, 1056 (1978) (hereinafter Note, Religion). We recognize our limited expertise in this endeavor and proceed carefully to outline the relevant facts necessary for mediating the instant confrontation between the dictates of religious conscience and the pragmatic needs of the state.
 
 A.
 
 4
 The International Society for Krishna Consciousness (ISKCON), plaintiff in this case, is a not-for-profit New York corporation, one of many worldwide Krishna Consciousness associations. The Krishna movement in this country was founded in the mid-1960s, when A.C. Bhaktivedanta Swami Prabhupada left India at the behest of his Spiritual Master to open a religious center in New York City. Krishna Consciousness falls under the broad theological umbrella of the Vaishnava Tradition of Bhakti Hinduism, formalized in the ninth century in Southern India. The canonical sources for the Hindu faith are the Vedic scriptures, and all practicing Hindus believe in their authenticity. The Veda consists of two parts: Samhita, which deals with ritual and contains the incantations directed to the Vedic deities; and the Upanishadas, which is the metaphysical interpretation of the ritualistic scripture.[1] Secondary texts and commentaries, known as smriti, include the Bhagavad-gita and Srimad Bhagavatam, compiled 500 and 1500 years after the Vedic scriptures, respectively.
 
 
 5
 Hinduism is an extraordinarily diverse tradition; embracing many sects and movements. The Bhakti movement, based on devotion to a personally chosen deity, can be traced to the times of the Bhagavad-gita. Sankirtan, an aspect of which is at issue in this case, was first identified as a religious ritual in the Srimad Bhagavatam, during the ninth century A.D. In the broad Bhakti tradition, sankirtan involved congregational chanting of the name of the deity or that of a teacher and included highly stylized thespian and dancing action. Sankirtan was intended to bring a devotee closer to God and invoke others in such worship. Other forms of observance include Puja, a worship of a deity or its image through ritualistic offerings, and chanting in a temple. When a temple priest performs a particular ritual for lay members of a sect, donations are offered.
 
 
 6
 Krishna Consciousness is an outgrowth of the Chaitanya movement of Bengal, which derives from the Bhakti tradition. Bhaktiedanta Swami Prabhupada was the eleventh in a chain of disciples of Sage Chaitanya, who lived from 1486-1533 and was understood by his followers to be an incarnation of God, or Krsna. Lord Chaitanya made the chanting of the Hare Krishna mantra central to sankirtan. He opened up the process of spiritual liberation to the masses by bringing into his movement people who were outside the standard Hindu community and the caste system and proclaimed that one day his name will be chanted in every town and village of the world. His biography, Sri Caitanya Caritamrta, is considered part of the scriptures by the Krishna Consciousness Movement.
 
 
 7
 Devotees of Krishna Consciousness follow the rituals of the Chaitanya movement. They surrender their material possessions, change their diet, lifestyle and physical appearance, and devote themselves to service of their Lord. Many devotees attend frequent temple services and spend considerable periods of time ritualistically chanting with the aid of their prayer beads (japa). Sankirtan is also an essential part of the Krishna faith. Under the Chaitanya tradition, the goal of this practice is to invoke the community in worship, carrying the name of God to as many people as possible. The solicitation of contributions and the distribution of literature is permitted, but, in doing so, the devotees are supposed to use "true and gentle speech," first identifying their religious order and spiritual leader. Moreover, devotees cannot touch potential donors without their consent.
 
 
 8
 The American Krishna Consciousness movement is more aggressive in its practice of sankirtan. To this sect, sankirtan calls for broadcasting the glories of the Lord by any means possible. Nonbelievers, this sect maintains, are spiritually impure and can only achieve spiritual rebirth by surrendering their material possessions and recognizing Krsna as the source and provider of both the spiritual and material worlds. The American movement has stressed the importance of solicitations and purportedly teaches that its devotees can best serve their spiritual masters if they conduct themselves as ideal persons, spreading the religion's teachings by example. To contact as many nonbelievers as possible, ISKCON members frequently shed their alien robes, remove the ceremonial paint worn on their face, don Western clothing and wigs, and humbly approach individuals in various public forums airports, bus stations, state fairs. Communication is initiated by handing a person a small gift and then attempting to sell religious literature or phonographic recordings.
 
 B.
 
 9
 This case arises because ISKCON seeks to perform the peripatetic ritual of sankirtan at the New York State Fair. The Fair is an annual event held in late August and early September on fairgrounds owned by the State in the town of Geddes, New York, near Syracuse. The Fair is a cooperative enterprise between two public agencies: the Division of the State Fair of the State Department of Agriculture and Markets and the New York State Industrial Exhibit Authority.
 
 
 10
 Approximately 20 of the fairground's 350 acres are occupied by actual exhibits and pedestrian walkways.[2] The fair was held for seven days in 1977, and the attendance was 526,000. In 1978 and 1979 the duration of the fair was increased to ten days, and attendance rose to 686,000 and 701,000, respectively.
 
 
 11
 Many exhibitors at the Fair represent agricultural and industrial concerns whose businesses are in New York State. In addition, religious, fraternal, and political groups participate, spreading their ideas to the public. These groups have included Right-to-Life, Planned Parenthood, the Seventh Day Adventists, and the Knights of Columbus. Members of these organizations solicit donations, distribute literature, and engage in discussions with fairgoers. There are no limitations on the dissemination of written materials or the discussion of these organizations' programs; members are free to roam the fairgrounds and approach fairgoers as they please. A longstanding, but unwritten, "booth" rule, however, restricted the solicitation of funds to booths or similar types of spaces leased by the various groups. This "booth" rule was formalized in writing in June 1978.[3]
 
 
 12
 Several months prior to the 1977 Fair, ISKCON contacted State Fair authorities and sought permission to engage in the solicitation activities of sankirtan on the fairgrounds. There was no response, and on August 29, the day before the start of the Fair, ISKCON and one of its devotees, Alan Attias (Aja Dasa), sued Governor Carey, the Commissioner of the State Department of Agriculture and Markets, and the Director of the Industrial Exhibit Authority under 42 U.S.C. § 1983 in the federal district court of the Northern District of New York to enjoin enforcement of the then-unwritten "booth" rule. Plaintiffs alleged that their free speech and free exercise rights were threatened and sought a declaration that the no-solicitation rule was unconstitutional on its face and as applied. Judge Port held a hearing on August 30, and granted a temporary restraining order to last for the duration of the Fair. Fair officials were enjoined from applying the rule to Krishna devotees. The order was conditioned on the requirements that the ISKCON members pay the normal admission price, limit their activities to areas normally open and available to the public, and restrict their activities to the normal hours of the Fair's operation. Judge Port also permitted the parties to agree to further restrictions of the devotees' conduct ISKCON had suggested, without response from Fair officials, that the adoption of certain procedures governing registration, identification and solicitation would guarantee that sankirtan would be performed in a peaceful, non-fraudulent manner.
 
 
 13
 The suit was not pursued after the 1977 Fair, but in August 1978, three days before the start of the annual event, plaintiffs filed another verified complaint seeking similar temporary relief. At oral argument on August 28, Judge Munson issued a TRO effective through September on the basis of the 1977 complaint.[4] ISKCON members were permitted access to the fair subject to a number of conditions they agreed to observe. The stipulated conditions required the devotees to pay the normal admission price; to limit their activities to public places and to normal hours of the Fair's operation; to designate one of their members as a liaison for providing information to Fair officials and for informally resolving complaints fairgoers or exhibitors might raise concerning ISKCON conduct; to register with Fair officials before engaging in sankirtan; to wear identification badges; to avoid deliberately touching any unconsenting fairgoer; and to avoid soliciting persons waiting in line or seated at a performance. After an additional hearing, Judge Munson extended the TRO to September 4. Based on several complaints from exhibitors and fairgoers, he amended his order to banish the devotees from the "Cow Barn" on the fairgrounds.
 
 
 14
 Defendants filed an answer to the pending 1977 complaint in January 1979, asserting that the "booth" rule did not violate any of the plaintiffs' constitutional rights. The rule was justified, they asserted, on the grounds that it prevented congestion and protected fairgoers and exhibitors from any interference caused by roving solicitation. In opposing ISKCON's subsequent motion for summary judgment, the State also claimed that the antisolicitation rule was necessary to prevent Krishna devotees from touching fairgoers without their consent, and to prevent littering and fraud. Judge Munson denied the motion on August 23, 1979, stating that a trial would be necessary to weigh adequately the relative importance of solicitation to the performance of the sankirtan ritual and the governmental interests behind the "booth" rule. Several days after the start of the 1979 Fair, Judge Port granted a preliminary injunction restraining defendants from interfering with ISKCON's practice of sankirtan. The twenty-one stipulated restrictions embodied in the 1978 TRO were also contained in the 1979 injunction.[5]
 
 C.
 
 15
 Trial on the merits commenced on April 21, 1980[6] before Judge Munson, and consumed eleven trial days. Fifteen hundred pages of testimony were taken and forty-four witnesses were called by the parties, including ISKCON devotees, religious experts, a former ISKCON member, and several state and county fair officials from the Northeast. Extensive testimony was presented by both sides concerning the theoretical underpinnings and the actual mechanics of the solicitation process.
 
 
 16
 The accounts of the practice of sankirtan differed significantly. ISKCON devotees indicated that members typically offer fairgoers a "prasada," or small sanctified gift. Those gifts include artificial flowers, pieces of candy, sticks of incense, or small buttons that read, "I love New York" or "Keep on Trucking." The devotee then tries to sell religious literature, a magazine entitled "Back to Godhead," or a record produced by the Krishnas. This process spreads the word of Lord Krsna to the uninitiated by the dissemination of religious scripture and by enabling misguided souls to rechannel their material wealth to a more spiritual concern.
 
 
 17
 Krishna priests testified that devotees are taught, as part of their religious instruction, to satisfy their spiritual masters. The priests instruct devotees generally to act in a humble and truthful manner, and in particular to avoid deceit in the practice of sankirtan. Several Krishna priests noted that specific money-raising techniques are not included in the course of spiritual instruction. Notwithstanding this goal of humble solicitation, the Krishnas conceded that, on occasion, some devotees are overenthusiastic and overaggressive, and appear to harass or defraud members of the public. This is due to inexperience, they claimed at trial, and an effective liaison system between ISKCON leaders and state fair administrators, serving as an informal dispute resolution mechanism, they urged, could minimize the number of complaints and misunderstandings.
 
 
 18
 The State's witnesses presented a dramatically different account of sankirtan. Several fairgoers testified that ISKCON members approached them and initiated discussion by either pinning a flower or button on their lapel without permission or by placing a record in their hand. Identification badges frequently were not worn, or were hidden beneath sweaters or the straps of shoulder bags that ISKCON devotees typically carry. Discussion of a religious nature rarely followed; instead devotees would vaguely ask for a contribution to help "starving children" or "drug addicts." Witnesses testified that devotees portrayed themselves as representatives of contests giving away records to the 50 best-looking couples or as radio station employees offering a record if the fairgoer named the correct radio station. Several fairgoers stated that when the Krishnas handed them record albums, they were led to believe that performances by several notable "stars" including George Harrison, Stevie Wonder, and Bob Marley appeared on the albums. In fact, small print on the record jackets indicated that these performers only "contributed to" or "supported" the ISKCON movement.
 
 
 19
 Evidence was also presented that many devotees cajoled fairgoers into giving larger contributions and attempted to shortchange donors by folding over bills and by distracting the fairgoers with conversation while providing change. Devotees also on occasion "targeted" their contributors, approaching those most likely to succumb to pressure to contribute young couples with small children, teenagers, handicapped individuals, and groups of retarded persons. Fair exhibitors testified that ISKCON solicitors frequently approached people in line or seated at a performance and drove away fairgoers from their booths and exhibition areas.
 
 
 20
 Although the liaison system occasionally resulted in disgruntled fairgoers receiving refunds of their "contributions," State Fair administrators and security officials noted that the greatest number of complaints from fairgoers and exhibitors filed at the Fair's Administration Building concerned allegations of ISKCON misconduct. No precise number of complaints was gathered, and state police officials took the drastic step of arresting several devotees for harassment, disorderly conduct, and fraudulent misrepresentation during the 1977, 1978, and 1979 Fairs.[7] In some cases, the ISKCON defendants pleaded guilty, but, in others, charges were dismissed or never processed.
 
 
 21
 The State also presented the testimony of a former Krishna member, who stated that she was explicitly taught to lie and deceive members of the public when engaging in sankirtan. This conduct was permissible, she allegedly was told, because both the donor and devotee benefit from the transfer of material wealth to Lord Krsna. On cross-examination, however, it was established that, while she was a devotee for six months, she only engaged in sankirtan for one-and-one-half weeks. No specific instructions in solicitation techniques were taught by Krishna priests in class. Instead, a woman with whom she was assigned to solicit informed her of the nuances of "transcendental trickery." A Krishna priest testified that ISKCON was aware of the problems caused by this devotee's overaggressiveness in performing sankirtan, and that her spiritual teachers informed her of the errors of that approach.
 
 
 22
 Finally, the State presented evidence from Syracuse police officials and from security personnel for shopping malls, raceways, and other fairs, where ISKCON devotees also engaged in sankirtan. Problems similar to those encountered at the New York State Fair arose shortchanging, misrepresentation, failure to wear identification badges, and the touching of members of the public and patrons without consent.
 
 
 23
 Judge Munson dismissed the ISKCON complaint on August 25, 1980, 506 F.Supp. 147 (N.D.N.Y.1980). Because the tenets and practices of Krishna Consciousness had not previously been examined by a court of law,[8] Judge Munson filed an extensive opinion to accompany his order of dismissal. He outlined in great detail the theological premises of the ISKCON movement and described both Krishna's and the State's account of sankirtan.
 
 
 24
 The narrow "booth" rule, Judge Munson found, limits only peripatetic solicitation for money and does not regulate the dissemination of literature or the discussion of ideas. Therefore, the rule is not impermissibly content-based. Judge Munson then characterized the solicitation aspect of sankirtan as "commercial speech," worthy of less constitutional protection than religious or political speech. The rationale for limiting commercial solicitation to prevent fraud is compelling; the evidence at trial demonstrated that the Krishna's scheme of accosting, deceit, and misrepresentation is "systematic, symptomatic and patternistic." Id. at 170. Finally, the "booth" rule was necessary, the judge held, because less restrictive alternatives reliance on the liaison system and on the criminal law to police fraud were ineffective. Accordingly, because plaintiff's constitutional rights were not violated, the complaint was dismissed.
 
 
 25
 ISKCON's appeal from this judgment is now before us.
 
 II.
 
 26
 Turning to the law in this difficult free exercise area, we recognize at the outset that the issues raised in this case can be resolved only by resorting to traditional First Amendment jurisprudence. Our Veda, as it were, is the text of the Constitution, which boldly asserts, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Our secular though learned commentaries, analogous to the Bhagavad-gita and the Srimad Bhagavatum, are the careful teachings of the Supreme Court. We have been instructed that First Amendment freedoms are incorporated in the Fourteenth Amendment, and therefore also limit the actions of state governments.[9] These cases provide the needed guidance for analyzing problems involving religious freedom.
 
 
 27
 Initial characterizations of conduct are important, if not dispositive, within the First Amendment realm. If, as Judge Munson held, the solicitation aspect of sankirtan is merely a form of commercial speech, the state is required to show only that its regulation is reasonable. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council Inc., 425 U.S. 748, 772 n.24, 96 S.Ct. 1817, 1831, 48 L.Ed.2d 346 (1976). If, on the other hand, this activity is recognized as the good faith observance of religious belief, the existence of a compelling state interest would be the only justification for imposing a burden on its free exercise. The state would have to prove that no less restrictive alternatives of accomplishing its goals are available. Sherbert v. Verner, 374 U.S. 398, 403, 407, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963). The task of distinguishing between purely commercial conduct and religious activity is difficult where religious solicitations are involved. Murdock v. Pennsylvania, 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943). This is especially so in this case, unlike other disputes involving ISKCON and state fair anti-solicitation rules,[10] because the parties have been unable to stipulate any facts concerning the theological basis and the actual practice of sankirtan. Instead, we must evaluate the findings of the district court and the evidence before it to determine, at the outset, whether we are dealing with religion and a religious belief or practice.
 
 A.
 
 28
 In determining whether the Krishna beliefs, credos, and philosophy, as well as the particular practice of sankirtan, are sufficiently "religious" in nature to warrant the protection of the free exercise guarantee, we look initially to the underlying purposes of this constitutional safeguard. The free exercise of religion promotes the inviolability of individual conscience and voluntarism, recognizing that private choice, not official coercion, should form the basis for religious conduct and belief. Walz v. Tax Commission, 397 U.S. 664, 694, 90 S.Ct. 1409, 1424, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring). More importantly, voluntarism promotes pluralism of thought, a tonic necessary for a healthy, diverse society. See id. at 689, 90 S.Ct. at 1421 (Brennan, J., concurring).[11]
 
 
 29
 These broad goals can best be satisfied if any belief that is "arguably religious" is considered "religious" for the sake of free exercise analysis. L. Tribe, American Constitutional Law § 14-6, at 828 (1978).[12]
 
 
 30
 Initial attempts to define religion, however, were less expansive, relying instead on formal distinctions between belief and conduct. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878), and on specific Judeo-Christian theistic doctrines. Thus, in Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890), the Court, in upholding an Idaho statute prohibiting Mormon polygamists from voting, expressed its normative judgment of the Mormon faith, "(t)o call their advocacy (of polygamy) a tenet of religion is to offend the common sense of mankind." Id. at 341-42, 10 S.Ct. at 300. The Court noted that "the term 'religion' has reference to one's views of his relations to his Creator " Id. at 342, 10 S.Ct. at 300; see also Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946) (upholding Mann Act conviction of Mormon fundamentalist who crossed state lines with his wives).
 
 
 31
 The objective content-based approach of the early cases has been replaced[13] by a more subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system. In United States v. Ballard, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944), the Court noted that the availability of a free exercise defense cannot depend on the objective truth or verity of a defendant's religious beliefs. See also Thomas v. Review Board, -- U.S. --, --, 101 S.Ct. 1425, 1429, 67 L.Ed.2d 624 (1981) ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection"). Instead, courts will investigate an adherent's sincerity and will then invoke free exercise analysis where a belief is asserted and acted upon in good faith. One consequence of the adoption of the subjective test is the abandonment of any requirement that the religion include a traditional concept of "God." This approach was followed in Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961). In overturning a provision of the Maryland Constitution requiring state officials to declare their belief in the existence of God, the Court noted that a "religion," as that term is ordinarily used, need not be founded on a belief in that fundamental premise. Id. at 495, 81 S.Ct. at 1683. The opinion stated that several non-theistic belief-systems are commonly recognized as "religions," including Buddhism, Taoism, Ethical Culture, and Secular Humanism. Id. at 495 n.11, 81 S.Ct. 1684, citing Washington Ethical Society v. District of Columbia, 249 F.2d 127 (D.C.Cir.1975) (Burger, J.). The Court recently reiterated this approach, albeit in the context of statutory interpretation, in its analysis of the conscientious objector provisions of § 6(j) of the Universal Military Training and Service Act, 50 U.S.C. app. § 456j. The test for identifying an individual's belief " 'in a relation to a Supreme Being'," the Court noted, is "whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the (statutory conscientious objector) exemption." United States v. Seeger, 380 U.S. 163, 166, 85 S.Ct. 850, 854, 13 L.Ed.2d 733 (1965); see also Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970).[14] The Seeger Court cited with approval the use of a functional, phenomenological investigation of an individual's "religion" advocated by liberal theologian Paul Tillich.[15] In the absence of a requirement of "God," this approach treats an individual's "ultimate concern" whatever that concern be as his "religion." A concern is "ultimate" when it is more than "intellectual." Note, Religion, supra, at 1075 & n. 108. A concern is more than intellectual when a believer would categorically "disregard elementary self-interest in preference to transgressing its tenets." United States v. Kauten, 133 F.2d 703, 708 (2d Cir. 1943) (A Hand, J.). We adopt this methodology in this case, and therefore recognize that our limited task is to determine only the role that Krishna Consciousness plays in the life of an ISKCON devotee. See Note, Religion, supra, at 1075.
 
 
 32
 We think it is clear that Krishna Consciousness is a "religion" for free exercise purposes. Adherence to the sect's theological doctrines is an "ultimate concern" of the devotees. Forsaking the pleasures of the material world, donning strange clothing and altering one's diet, arising daily at 4 a. m. to chant religious prayers, and perhaps experiencing the scorn and derision of nonbelieving friends and family, ISKCON devotees govern their life by a "religious" philosophy.
 
 
 33
 Additional objective criteria adduced at trial also demonstrate the stature of the Krishna philosophy as a "religion" in the more traditional sense. Krishna Consciousness is an outgrowth of the ancient and diverse Hindu tradition. In fact, one religious expert at trial remarked that the American movement is "one of the most unusual examples of transfer of a cultural tradition across broad national and cultural barriers " This evidence of historical longevity and theological consistency should not be ignored. See, e. g., Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed. 15 (1972) (Amish tradition); People v. Woody, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964) (Native American church).[16] Moreover, we think it significant that the Krishna Consciousness Movement has attracted thousands of devotees throughout the world. The Krishna faith, even if viewed apart from Hinduism, has an "elaborately articulated body of religious doctrine." See Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development. Part I. The Religious Liberty Guarantee, 80 Harv.L.Rev. 1381, 1419 (1967). Bhaktivedanta Swami Prabhupada, founder of the American Krishna Consciousness Movement, was a noted scholar, and his writings supplement the more traditional scriptures studied by ISKCON devotees. Existence of this literature and doctrine makes it more likely that a set of beliefs can serve as an individual's "ultimate concern." Finally, it is significant that the government has determined that a particular organization is religious in nature; the nonprofit tax exempt status accorded ISKCON by New York State and the Internal Revenue Service cannot be ignored. See Washington Ethical Society, supra.
 
 
 34
 In sum, based on objective evidence of ISKCON devotees' commitment to Krishna Consciousness, we conclude that adherence to the principles of that theology is the most important interest in their lives. Accordingly, we hold that the American Krishna Consciousness Movement is a "religion" for purposes of the free exercise clause.
 
 B.
 
 35
 The more specific problem we face is determining whether sankirtan, requiring under ISKCON's interpretation the peripatetic solicitation of funds, is a "religious practice" falling within the framework of free exercise analysis. Once again, it is painfully obvious that lay courts familiar with Western religious traditions characterized by sacramental rituals and structured theologies are ill-equipped to evaluate the relative significance of particular rites of an alien faith. We can perform our duty diligently, however, if we carefully consider two factors: the sincerity of the devotees who practice sankirtan, and the centrality of this practice to the Krishna Consciousness religion. See L. Tribe, supra, § 14-11.
 
 
 36
 Sincerity analysis seeks to determine the subjective good faith of an adherent in performing certain rituals, id. The goal, of course, is to protect only those beliefs which are held as a matter of conscience. Human nature being what it is, however, it is frequently difficult to separate this inquiry from a forbidden one involving the verity of the underlying belief. United States v. Ballard, supra, 322 U.S. at 92-95, 64 S.Ct. at 889-890 (Jackson, J., dissenting). People find it hard to conclude that a particularly fanciful or incredible belief can be sincerely held. Therefore, this analysis is most useful where extrinsic evidence is evaluated. For example, an adherent's belief would not be "sincere" if he acts in a manner inconsistent with that belief, Dobkin v. District of Columbia, 194 A.2d 657 (D.C.1963) (member of Jewish faith who works on Saturdays cannot claim a free exercise violation by being compelled to appear in court on the Sabbath), or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine, see Thomas v. Review Board, supra, -- U.S. at --, 101 S.Ct. at 1429, Note, Religious Exemptions Under the Free Exercise Clause: A Model of Competing Authorities, 90 Yale L.J. 350, 371 (1980); Note, Religion, supra, 91 Harv.L.Rev. at 1081 & n.122 (joining the Universal Life Church in Hardenburgh, New York merely to claim property tax exemptions). A believer's sincerity is also evaluated in light of the religion's size and history, see Wisconsin v. Yoder, supra; Woody, supra, but this is not dispositive. Cf. Thomas v. Review Board, supra, -- U.S. at --, 101 S.Ct. at 1429 (intrafaith differences in articulating religious philosophy do not render free exercise analysis inapplicable).
 
 
 37
 In determining centrality, on the other hand, we look to the role that the rite or belief plays in the ritual and theology of the religion in question. Sacramental practices are given great weight, see, e. g., People v. Woody, supra (use by members of the Native American Church of hallucinogenic peyote to worship God is "religious"); Leary v. United States, 383 F.2d 851 (5th Cir. 1967), rev'd on other grounds, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) (use of marijuana is not "religious" where defendant presented no formal evidence of its necessity in the practice of Hindu mysticism). Affirmative duty-creating commands are also considered "central" to a religion's doctrines. For example, in Wisconsin v. Yoder, supra, the Court found that the Amish faith required its members to minimize contact with worldly influences by discontinuing formal schooling after the eighth grade. Similarly, the Court noted in Sherbert v. Verner, supra, that Seventh Day Adventism strongly forbids its adherents from working on the Sabbath. And, the sale of religious literature and the solicitation of contributions is central to missionary evangelism, particularly to the Jehovah's Witnesses, Murdock, supra, 319 U.S. at 108-09, 63 S.Ct. at 872-873. In contrast, there are no affirmative commands in Judaism requiring work on Sunday, the Christian day of rest, Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961), or upon Mormons to practice polygamy, United States v. Reynolds, supra.
 
 
 38
 Extrinsic evidence demonstrates that the devotee's beliefs in the importance of sankirtan are genuine to a sufficient degree. We recognize the difficulty in determining whether there is an inconsistency between precept and practice. In the broadest sense, sankirtan requires the solicitation of funds to free nonbelievers from their material concerns and divert their attention to holier matters. The narrower principle is that this solicitation be performed in a humble and truthful manner. Evidence adduced at trial demonstrates that these narrow principles frequently were not followed by ISKCON members at the State Fair. But, this conduct can be said to be consistent with the general spiritual purpose of sankirtan. Our analysis of the devotees' good faith cannot hinge on our lay evaluation of Krishna theology.
 
 
 39
 Notwithstanding an apparent inconsistency between doctrine and actual behavior, however, there is also extrinsic evidence to demonstrate the sincerity of the devotees' beliefs. Defendants have not shown that individual devotees, or even any other ISKCON members not directly participating in sankirtan, relied on the proceeds of their solicitation efforts for personal gain. ISKCON devotees lead materially sparse lives, and we cannot conclude that their motivation for engaging in sankirtan is nonreligious in nature. Finally, that the law condemns fraud and misrepresentation does not evidence ISKCON's bad faith. The state's reaction to a religious practice sheds little light on the sincerity of those who engage in the enjoined conduct.[17] ISKCON devotees have faced criminal liability for their conduct. Based on this record, it is difficult to determine whether this exposure to legal liability is a sincere act of conscience by ISKCON devotees or a calculated decision to risk occasional punishment as a cost of engaging in a highly profitable, and fraudulent, conduct. Therefore, while the sincerity test alone cannot resolve the difficult question concerning the "religious" aspect of sankirtan, we conclude that the devotees are sufficiently sincere in their beliefs to justify our proceeding to the next step of the analysis.
 
 
 40
 Turning to centrality, we find that the solicitation of contributions is significant in the Krishna Consciousness theology, and can be analogized to a sacramental ritual or an affirmative command of the religion's teachings. ISKCON's religious experts testified that sankirtan is an ancient tradition of the Chaitanya movement. Sankirtan, in the sense of spreading the glories of the Lord, can theoretically be practiced without the solicitation of funds. But, according to one expert, disciples have been permitted to seek contributions and food to sustain their spiritual masters since ancient times, and sankirtan without solicitation is only possible where an entire community is involved in the worship of Krsna and in making offerings and donations to support the activities of the temple. In our Western society, of course, such a unified Hindu religious community is not present. In this country, the missionary evangelism at the core of the Chaitanya movement can only be sustained by voluntary contributions, and therefore a restraint on soliciting funds would chill the exercise of the underlying religious activity as well. See Murdock, supra, 319 U.S. at 108-09, 63 S.Ct. at 872-873. "The mere fact that religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise It is plain that a religious organization needs funds to remain a going concern." Id. at 111, 63 S.Ct. at 874. We would be hard pressed, then, to separate the mere proselytization component of sankirtan from its solicitation aspect, characterizing the one as a religious rite and the other as commercial speech. Moreover, the testimony at trial established that today many sects, including those in India, solicit contributions for particular divinities or teachings. We find that the adaptation of an ancient ritual to accommodate religious needs with the realities of the modern world does not minimize the importance of the practice. Frustration of this important ritual would prevent ISKCON members from fulfilling a central duty of their faith, removing the "theological heart" of the religion. People v. Woody, supra, 394 P.2d at 818. See also Wisconsin v. Yoder, supra; Sherbert v. Verner, supra.[18]
 
 
 41
 Defendants claim that sankirtan is not central to the ISKCON faith because not all devotees engage in this practice. They point to evidence that sankirtan is regularly performed by only twenty-five of the approximately 190 members of the New York Temple. We are reluctant to criticize such a theological division of labor. The ISKCON spiritual masters have determined that a certain number of their devotees must perform sankirtan. Others serve the Lord by engaging in different devotional activities, including temple worship, farming, and teaching. In People v. Woody, supra, the sacramental use of peyote was held to be a central ritual of the Native American Church, although children and young women did not partake of the drug. 394 P.2d at 817. Similarly, although only a priest, minister, or rabbi performs certain Christian and Jewish rituals, we could not seriously conclude that those practices were not central to those religions.
 
 
 42
 We hold, therefore, that sankirtan, and the solicitation of funds, is a "religious activity" deserving of free exercise protection.[19]
 
 III.
 
 43
 We note that the State's "booth" rule response acts as a total limitation on the free exercise of a sankirtan. This absolute prohibition is a "substantial infringement," Sherbert v. Verner, supra, 374 U.S. at 406, 83 S.Ct. at 1795, of a doctrine and ritual central to the ISKCON faith. Compare Wisconsin v. Yoder, supra (compulsory education requirement); People v. Woody, supra (ban on use of peyote), with Braunfeld v. Brown, supra (Sunday closing law does not prevent Orthodox Jew from observing the Sabbath); Corporation of Presiding Bishop v. City of Porterville, 90 Cal.App.2d 656, 203 P.2d 823, appeal dismissed, 338 U.S. 805, 70 S.Ct. 78, 94 L.Ed. 487 (1949) (free exercise clause not violated where zoning regulations exclude churches from residential areas). The "booth" rule is not merely a "slight inconvenience" to the faithful, Cantwell v. Connecticut, 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940); it prevents ISKCON devotees from engaging in the religious rite of peripatetic solicitation, a ritual that cannot be performed within the confines of a booth. Because this limitation strikes at the "core values" of Krishna Consciousness, see L. Tribe, supra, § 14-4, at 862, ISKCON's First Amendment claims must be assigned a high value when balanced with the State's interest in enforcing the anti-solicitation rule.
 
 IV.
 
 44
 Actions and practices falling within the bounds of the free exercise clause can only be overcome by governmental interests "of the highest order." Wisconsin v. Yoder, supra, 406 U.S. at 215, 92 S.Ct. at 1533. Religious expression, including solicitation, is subject to reasonable time, place and manner regulation. Cantwell, supra, 310 U.S. at 303-04, 60 S.Ct. at 903,[20] but such limitations are justified only by a compelling interest in public safety, peace, or order, Sherbert v. Verner, supra, 374 U.S. at 403, 83 S.Ct. at 1793, which must be demonstrated by the state. See Elrod v. Burns, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976). The government must also show that no less restrictive means to achieve its end are available. Thomas v. Review Board, supra, -- U.S. at --, 101 S.Ct. at 1429; Sherbert v. Verner, supra, 374 U.S. at 407, 83 S.Ct. at 1795. These tasks are particularly difficult where the governmental regulation takes the form of a prior restraint of First Amendment expression. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975).[21]
 
 
 45
 Analysis of the governmental interests asserted by the defendant in this case requires an investigation of the importance of the secular value being advanced by the anti-solicitation "booth" rule and the relationship that this regulatory scheme bears to the underlying purpose. Giannella, supra, at 1390. There is little doubt that the major purpose of the rule before us is the prevention of fraud.[22] This is a legitimate compelling goal, aimed at protecting the public welfare. Schaumberg v. Citizens for a Better Environment, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980). Fraudulent appeals may not be made to the public in the name of charity or religion. Schneider v. State, 308 U.S. 147, 164, 60 S.Ct. 146, 84 L.Ed. 155 (1939); see also Cantwell v. Connecticut, supra, 310 U.S. at 306, 60 S.Ct. at 904. The importance of this goal is demonstrated by the severity of responses the state can constitutionally employ to combat fraudulent solicitation: criminal liability, Schaumberg, supra, 444 U.S. at 637, 100 S.Ct. at 836, Cantwell, supra, 310 U.S. at 306, 60 S.Ct. at 904, civil liability for fraud and battery, ISKCON v. Bowen, 600 F.2d 667, 669-70 (7th Cir.), cert. denied, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979); and procedures requiring the registration and identification of itinerant missionaries, Cantwell, supra, 310 U.S. at 306, 60 S.Ct. at 904.
 
 
 46
 The trial record establishes that the state's interest in preventing fraud is particularly compelling in this case. During the three years that ISKCON followers engaged in sankirtan at the Fair 1977, 1978, and 1979 the number of fairgoers' complaints of fraudulent misrepresentations and harassment by roving representatives of ISKCON was significant. Moreover, the problem was sufficiently serious that several arrests of devotees were made by the police during these years. Judge Munson carefully evaluated the evidence of ISKCON misconduct. We agree that its devotees have not presented their religion to the public in a particularly sympathetic or favorable fashion.
 
 
 47
 The anti-solicitation rule bears a very close relationship to the state's goal in preventing fraud. The rule permits the exchange of money only at booths and similar spaces leased by exhibitors. Fraudulent transactions, of course, will not be eliminated by this regulatory "scheme." They can be significantly reduced, however, because security personnel will be able to focus their investigatory efforts on those designated locations where cash transactions occur. We therefore acknowledge the importance of combating fraud and the effectiveness of the "booth" rule in pursuing that goal.
 
 
 48
 In a religion case, however, a compelling interest and a statute well-tailored to its goal are not enough. The state, to save its law, must show there are no less restrictive means of achieving its end. Regulations prohibiting peripatetic solicitation or limiting such activity by requiring prior administrative approval have consistently been invalidated on this ground. In Cantwell v. Connecticut, supra, the Court reversed the conviction of a Jehovah's Witness for soliciting without a state certificate and for committing a breach of the peace. The license requirement was void as a prior restraint of the free exercise of religion, and the Court suggested that less intrusive methods for punishing fraud were available. 310 U.S. at 306-07, 60 S.Ct. 904-905. The absence of a "statute narrowly drawn to define and punish specific conduct," id. at 311, 60 S.Ct. at 906, doomed the challenged regulation. See also Murdock v. Pennsylvania, supra (invalidating municipal ordinance requiring the payment of a license fee in order to distribute religious pamphlets and solicit contributions); Schneider v. State (anti-handbill ordinance). More recently, in Schaumberg v. Citizens for a Better Environment, supra, the Court held that fraudulent solicitations could be prevented by regulations less intrusive than an ordinance prohibiting solicitations by charitable organizations that used less than 75% of their receipts for "charitable purposes." 444 U.S. at 637, 100 S.Ct. at 836.
 
 
 49
 Given the strong weight of precedent condemning prior restraints on religious and political solicitation, the State of New York is faced with the difficult task of proving that less restrictive alternatives to the "booth" rule for combating fraud are unavailable. Judge Munson found that resort to the penal laws and to the ISKCON liaison system was unable to prevent the "widespread and systematic scheme" of fraudulent activity engaged in by some followers. We cannot agree. Our examination of the extensive trial record indicates that the state failed to demonstrate the ineffectiveness of other less intrusive means of regulation.
 
 
 50
 We believe that at least three alternative methods can satisfy the State's goals of preventing fraud and of deterring ISKCON misconduct and can do so in a manner less obnoxious to the First Amendment freedoms asserted here. First, the stipulated conditions governing the behavior of devotees at the Fair can be aggressively enforced. The reasonable regulation of solicitation is permissible, Cantwell, supra, 310 U.S. at 306, 60 S.Ct. at 904, and ISKCON and Fair officials have agreed to follow specific conditions necessary for insuring that fraudulent conduct does not occur. These stipulations have been frequently violated; there is evidence that devotees fail to wear or display prominently their identification badges, touch fairgoers without their consent, and initiate conversations with persons standing in line or seated at various performances. This misconduct, so intrusive that it would seem to violate even the limited privacy interests of fairgoers in a "public forum," cannot be tolerated.
 
 
 51
 The appropriate response, however, is not to ban all soliciting activities but to enforce the stipulated conditions. The district court, having adopted these limitations in its preliminary orders, can aggressively punish all violations by holding the errant devotees, and their supervisors who are aware of their systematic misconduct, in contempt of court. This action, we think, will convey to ISKCON the court's impatience at the flaunting of its orders, and should help deter undesirable behavior at the Fair. This approach has not been employed to date.
 
 
 52
 Second, we are not convinced that the liaison system (an informal dispute resolution mechanism to resolve fairgoers' complaints) is, as characterized by Judge Munson, a "sham." To the contrary, the trial record reveals that on several occasions, victimized fairgoers received "refunds" of their "contributions" after filing a complaint at the Fair's Administration Building. ISKCON's liaison officer played an active role in resolving these complaints. Moreover, one police officer acknowledged at trial that the ISKCON liaison, stationed at the Administration Building, reminded devotees of their obligations. Specifically, he noted that the liaison admonished members who were brought in for their failure to wear the requisite identification badges, and informed them that this conduct violated the stipulated conditions.[23]
 
 
 53
 Finally, we note that resort to the penal laws, which punish undesirable conduct after it occurs, is a more appropriate response to ISKCON misconduct than a sweeping prohibition on all solicitation, fraudulent and nonfraudulent. The state claims that this method of law enforcement is ineffective, because ill-intentioned ISKCON devotees violate the law with impunity, and return after their arrests to continue their illegal solicitations. The cure for this, of course, is harsher criminal penalties and more aggressive police efforts to identify fraud and harassment, requiring the creative use of plainclothes officers at the State Fair. The State cannot justify the implementation of an unconstitutional rule by proving the lassitude of its efforts in the past. Even the enactment of the stricter anti-solicitation rule will not necessarily stamp out fraud, for those ISKCON devotees willing to violate criminal statutes barring fraud and harassment might be equally willing to ignore a "booth" rule. As a result, their illegal conduct will not be significantly deterred and the constitutionally permissible behavior of well-intentioned Krishnas and others seeking to engage in solicitation will be frustrated. We find it constitutionally preferable to limit the application of harsh legal sanctions to only those narrow activities that deserve the law's opprobrium fraudulent solicitations. Because these three methods of combating undesirable activity are available, we hold that the "booth" rule is unconstitutional as applied to ISKCON at the Fair.
 
 V.
 
 54
 Our commitment to precious First Amendment freedoms is tested when unpopular organizations seek refuge within its scope. The ideas they advocate are frequently discomforting, unsettling, and obnoxious. Cantwell, supra (Jehovah's Witnesses attacking Catholicism in Catholic neighborhoods); Collin v. Smith, 578 F.2d 1197 (7th Cir.), cert. denied, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978) (Nazis demonstrating in a Chicago community of Holocaust victims). ISKCON advocates a philosophy alien to our Western traditions. Like the unpopular Jehovah's Witnesses of the 1930s and 1940s, however, its practitioners may come to be responsible for much of the law of religious freedom. L. Pfeffer, Church State and Freedom, supra, at 653-54. They are entitled to the First Amendment freedoms we all enjoy, and considerations of comfort or convenience cannot prevail.
 
 
 55
 The Krishnas, however, like the Jehovah's Witnesses, are not above the law. Murdock, supra, 319 U.S. at 116, 63 S.Ct. at 876. We do not hold today that they may not be prosecuted for activities that endanger the public welfare. Chaplinsky v. New Hampshire, 315 U.S. 568, 571, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942); Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). In holding that the New York State fair rule prohibiting peripatetic solicitation is unconstitutional, we do not condone the odious tactics of swindling and harassment hidden beneath a veneer of religion. But when we are asked to sacrifice legitimate First Amendment rights at the altar of law enforcement, we are given pause. The unpopular traditions, practices, and doctrines of alien religions need not receive our approval or support, but must be tolerated if our freedoms are to be preserved.
 
 
 56
 Judgment reversed.
 
 OAKES, Circuit Judge (concurring):
 
 57
 I concur in Judge Kaufman's opinion because it makes a genuine contribution to the First Amendment literature on pluralism, which helps to distinguish this country "so plainly from certain uniform, unified and uni-governed societies elsewhere in the world," see Americans United for Separation of Church & State v. Oakey, 399 F.Supp. 545, 553 (D.Vt.1972) (three-judge court) (concurring opinion). Although the Supreme Court will probably speak on the same subject in Heffron v. International Society for Krishna Consciousness, Inc., cert. granted, -- U.S. --, 101 S.Ct. 917, 66 L.Ed.2d 838 (1981), case argued, -- U.S. --, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), I believe it is important we do so too.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 At the extensive trial conducted by Judge Munson during April and May 1980, one expert in South Asian religions analogized the Vedic scriptures to the Five Books of Moses for the Jewish faith, the New and Old Testament for Christianity, or the Koran for the Moslem faith
 
 
 [2]
 The fairground proper also included several large parking lots, a racetrack, and a grandstand
 
 
 [3]
 Section 350.16(j) of the Rules and Regulations of the New York State Department of Agriculture and Markets provides in pertinent part:
 A licensee may solicit only from the space designated in the lease between the licensee and the Division of the State Fair.
 Section 13 of the Rules and Regulations of the New York State Industrial Exhibit Authority provides in pertinent part:
 No roving vendor or solicitor, acting for either a profit or nonprofit organization or on his own behalf, shall be permitted on the Fairgrounds or in any facility upon the Fairgrounds. Any and all solicitations for either contributions or sale must be made from within the confines of a booth or display. Any person or organization violating this rule will be promptly evicted from the New York State Fairgrounds for the duration of the Fair.
 These regulations were promulgated pursuant to New York Agriculture and Markets Law § 31-b (McKinney 1972) and New York Public Authorities Law § 1654(c) (McKinney 1981), respectively.
 
 
 [4]
 The new 1978 complaint was dismissed, and the 1977 complaint serves as the basis of the suit before us on appeal
 
 
 [5]
 Judge Port originally granted a restraining order pendente lite on August 28, but vacated that order several hours later because ISKCON's counsel was not available for a preliminary injunction hearing. As a result, the "booth" rule went into effect, and no Krishna devotees were permitted to enter the Fair. At least one member was involved in roving solicitation in violation of the rule. She was arrested and pleaded guilty to a charge of harassment. Judge Port subsequently barred her from engaging in any activity in connection with ISKCON, and reinstated the TRO on August 30. The preliminary injunction was granted on August 31
 
 
 [6]
 ISKCON's renewed motion for summary judgment was denied at the outset of the trial. Plaintiff Kenneth L. Solomon (Kesi Hanta) was added as an additional plaintiff. Judge Munson also dismissed the action as to Governor Carey, and as to the Commissioner of the Department of Agriculture and Markets and the Director of the Industrial Exhibit Authority in their individual capacities
 
 
 [7]
 There were one, six, and nine arrests respectively for the 1977, 1978, and 1979 Fairs
 
 
 [8]
 In similar cases involving ISKCON challenges to no-solicitation "booth" rules at state fairs, the parties stipulated to certain facts concerning the doctrinal foundations of sankirtan and the actual practice of this religious ritual. See, e. g., Edwards v. Maryland State Fair, 628 F.2d 282 (4th Cir. 1980); ISKCON v. Bowen, 600 F.2d 667 (7th Cir.), cert. denied, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979); ISKCON v. State Fair of Texas, 461 F.Supp. 719 (N.D.Tex.1978); ISKCON v. Colorado State Fair, 610 P.2d 486 (Colo.1980); ISKCON v. Heffron, 299 N.W.2d 79 (Minn.S.Ct.1980), cert. granted, -- U.S. --, 101 S.Ct. 917, 66 L.Ed.2d 838 (1981). This case seems to be the only one to have proceeded to a full trial
 
 
 [9]
 See Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)
 
 
 [10]
 See note 8 supra
 
 
 [11]
 The importance of these premises underlying free exercise analysis is recognized by leading commentators. See, e. g., L. Tribe, American Constitutional Law § 14-3, at 818 (1978); Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development. Part I. The Religious Liberty Guarantee, 80 Harv.L.Rev. 1381, 1386 (1967); Note, Toward a Constitutional Definition of Religion, 91 Harv.L.Rev. 1056 (1978) (hereinafter Note, Religion)
 
 
 [12]
 A less expansive definition of "religion" for establishment clause purposes suggesting that any practice or belief "arguably non-religious" not be considered religious for analysis of this clause has been offered. See L. Tribe, supra, § 14-6 at 828; Note, Religion, supra, at 1083-89. This narrow definition is necessary in an age of pervasive governmental activity; a broad reading of religion would bar the government on establishment clause grounds from providing even the most essential public services to religious organizations. Nevertheless, a dualistic approach, distinguishing between definitions in the free exercise and the establishment clause contexts, has been criticized as being unfaithful to the text of the First Amendment and to its history. Pfeffer, Freedom and/or Separation: The Constitutional Dilemma of the First Amendment, 64 Minn.L.Rev. 561 (1980)
 
 
 [13]
 The formal belief/action distinction articulated in Reynolds v. United States, 98 U.S. 145, 164, 25 L.Ed. 244 (1878), has been eroded by the Court, but is still invoked. In Murdock v. Pennsylvania, 319 U.S. 105, 109, 63 S.Ct. 870, 873, 87 L.Ed. 1292 (1943), the Court labelled the missionary act of distributing religious literature as "religious" and extended the same protection "as the more orthodox and conventional exercises of religion." The practice of religious solicitation was also upheld in Cantwell v. Connecticut, supra, but the Court noted that the freedom to act, unlike the freedom to believe, is not absolute. Id. at 303-04, 60 S.Ct. at 903. Thus, while not a useful analytic tool, the distinction still has some formalistic significance. See McDaniel v. Paty, 435 U.S. 618, 627, 98 S.Ct. 1322, 1328, 55 L.Ed.2d 593 (1978); Note, Religious Exemptions Under the Free Exercise Clause: A Model of Competing Authorities, 90 Yale L.J. 350, 353 & n.20 (1980)
 
 
 [14]
 This approach to the definition of religion followed that taken by Judge Augustus Hand in United States v. Kauten, 133 F.2d 703 (2d Cir. 1943). Interpreting similar provisions of selective service legislation, Judge Hand found that a religious impulse involves an individual's response "to an inward mentor, call it conscience or God." Id. at 708. The Seeger Court rejected a more traditional, objective definitional approach followed in Berman v. United States, 156 F.2d 377 (9th Cir.), cert. denied, 329 U.S. 795, 67 S.Ct. 480, 91 L.Ed. 680 (1946)
 
 
 [15]
 380 U.S. at 187, 85 S.Ct. at 864; see P. Tillich, Dynamics of Faith 1-2 (1958)
 
 
 [16]
 The absence of an association with an established religious tradition, however, does not necessarily preclude a particular belief-system from being categorized as a religion. See Seeger, supra
 
 
 [17]
 Thus, although polygamy is illegal, we cannot say that Mormons were not sincere in their observance of that practice, Reynolds v. United States, supra, since many adherents risked arrest and prosecution for their religious beliefs
 
 
 [18]
 Defendants' expert testified that proselytizing is not a theme in the broad Hindu tradition, implying perhaps that the peripatetic efforts of ISKCON devotees lack historical legitimacy. But, he conceded that there are many sects within this ancient religion and that varying rituals and beliefs are followed. We are loath to take sides in intra-religious ideological disputes. Thomas v. Review Board, -- U.S. --, --, 101 S.Ct. 1425, 1428, 67 L.Ed.2d 624 (1981)
 
 
 [19]
 Although we characterize this activity as "religious," we recognize that sankirtan also falls within the category of "speech." Religious solicitation, in fact, has been identified as the exercise of both constitutional rights, see Murdock v. Pennsylvania, supra, 319 U.S. at 109-10, 63 S.Ct. at 873. In determining the extent to which the state can interfere with the right to engage in solicitation, we rely primarily on free exercise analysis, see Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), but significant free speech cases are also apposite. See e. g., Schaumberg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980)
 
 
 [20]
 While the distinction between religious beliefs and religious action is more semantic than conceptual, see note 13 supra, it is still employed in First Amendment analysis. Only the former is accorded absolute protection. Sherbert v. Verner, supra, 374 U.S. at 402-03, 83 S.Ct. at 1792-93
 
 
 [21]
 First Amendment safeguards, of course, are only applicable where the actions of government officials are involved. Defendants in this case, the Division of the State Fair and the New York Industrial Authority, are both state agencies. Moreover, the State provides the operating budget, fairgrounds, and security for the Fair. Therefore, the actions of defendants in enforcing the "booth" rule clearly constitutes "state action." Burton v. Wilmington Parking Authority, 365 U.S. 715, 723-26, 81 S.Ct. 856, 860-862, 6 L.Ed.2d 45 (1961)
 It is equally apparent that the State Fair is a "public forum" in which the social interchange of ideas is especially appropriate. See Hague v. CIO, 307 U.S. 496, 515-16, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939) (opinion by Roberts, J.); Wolin v. Port of New York Authority, 392 F.2d 83, 88-91 (2d Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968). We agree that a fair "is almost by definition a congeries of hawkers, vendors of wares and services, purveyors of ideas, commercial, esthetic, and intellectual." ISKCON v. State Fair of Texas, 461 F.Supp. 719, 721 (N.D.Tex.1978).
 
 
 [22]
 In contrast, the record shows that other goals asserted by defendants in their answer and pre-trial papers the need to prevent congestion and to protect the privacy interest of fairgoers are not compelling. ISKCON solicitation has constitutionally been regulated where a serious congestion problem was demonstrated. See, e. g., ISKCON v. Eaves, 601 F.2d 809, 821-30 (5th Cir. 1979) (upholding regulation requiring that receipt of money by ISKCON members practicing sankirtan at the crowded Atlanta Airport take place only at a booth); ISKCON v. City of New York, 504 F.Supp. 118 (S.D.N.Y.1980) (limiting right to practice sankirtan in congested United Nations Plaza); ISKCON v. McAvey, 450 F.Supp. 1265 (S.D.N.Y.1978) (same at World Trade Center). But, the mere assertion of this interest without proof of actual congestion does not justify an infringement of First Amendment rights, e. g., Edwards v. Maryland State Fair, supra, 628 F.2d at 285. Judge Munson did not evaluate this state interest, or that of protecting fairgoers from unwanted intrusions, and we agree that defendants failed to develop the record to indicate that these concerns might justify infringing the First Amendment rights of ISKCON devotees
 
 
 [23]
 The operation of this mechanism at another Fair demonstrates its effectiveness. Judge Munson detailed five complaints involving ISKCON fraud and harassment at the September 1979 Eastern States Exposition in West Springfield, Massachusetts, to support his conclusion that liaison systems do not deter misconduct. 506 F.Supp. at 170. However, he failed to note that no arrests of ISKCON members were made at that Fair, and that, where complaints were filed by fairgoers, restitution was made in most cases. This indicates to us that the liaison system can be successful. Although it requires disgruntled fairgoers to suffer the inconvenience of filing a complaint, that small sacrifice is preferable to infringing the First Amendment rights of ISKCON devotees. This means of regulation may be less efficient than a "booth" rule's regime of prior restraint, but efficiency is not the only interest we examine in our balancing calculus. See Schneider v. State, 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939)