Ego BROWN, et al., Plaintiffs,

v.

Marion BARRY, et al., Defendants.

Civ. A. No. 88–565.

United States District Court,
District of Columbia.

March 21, 1989.

MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Plaintiffs are Ego Brown, a self-styled "shoeshine entrepreneur," and Willie Armstrong and Ernest James Lee, two homeless individuals whom Mr. Brown employed as "independent contractors" in his shoeshine enterprise. For some years prior to 1985 Mr. Brown operated an outdoor shoeshine business at various locations in the District of Columbia. He conducted this business under the auspices of a general vending permit issued by the District of Columbia. This permit was issued pursuant to the District of Columbia Municipal Regulations, Title 24[1], Chapter 5 which regulates vending and soliciting practices.[2] Mr. Brown began to employ homeless persons in the District, providing them with showers, shoeshine kits, and training. Mr. Brown's efforts achieved some notoriety and the District's Department of Social Services began referring homeless persons to him. However, in 1985 the District of Columbia, in a sharp reversal of position, withdrew Mr. Brown's vending permit and closed his sidewalk shoeshine business as an alleged violation of another District of Columbia Municipal Regulation enacted over eighty-three years ago. This is found in Title 24, Chapter 1, Section 112.4 which provides that "no permit shall be issued for

---

1. Title 24 of the District of Columbia Municipal Regulations is comprised of a number of different chapters regulating public safety and the occupation and use of public space.

2. The Council of the District of Columbia is authorized to make all such "reasonable and usual police regulations...." *See* D.C.Code Ann. §§ 1–315, 1–318, 1–319 (1987). Section 1–315(3) permits the Council "[t]o locate the places where licensed vendors on streets and public places shall stand, and change them as often as the public interests require, and to make all the necessary regulations governing their conduct upon the streets in relation to

such business." This code section has been variously interpreted. *See Crane v. District of Columbia,* 289 F. 557 (D.C.Cir.1923) (a pre-Home Rule holding that the D.C. Council was permitted to regulate the use of public places but was prohibited from banning vending altogether); *but cf. Service Employees Int'l Union v. District of Columbia,* 608 F.Supp. 1434, 1441 n. 9 (D.D.C. 1985) (holding that "[c]learly, the District has the authority to impose a complete ban on all vending on public property"); *Carranzo v. District of Columbia,* 10 F.2d 983 (D.C.Cir.1926) (upholding an outright ban on street vending in "congested areas").

a bootblack stand on public space." [3] For some time after his vending permit was suddenly revoked Mr. Brown attempted to conduct his shoeshine business in rented public space. However, in March 1988, because of rising costs due to inability to use public space, Mr. Brown, joined by two former employees, filed this action for declaratory judgment and injunctive relief against the District of Columbia and its Department of Consumer and Regulatory Affairs. It seeks the court's declaration that this regulation is unconstitutional, and an injunction barring its enforcement. Plaintiffs assert two Equal Protection challenges.[4] First, they allege that the regulation, which exists largely as an exception to the general vendor provisions and which prohibits the issuance of vendor's permits only to bootblacks, makes irrelevant and, therefore, constitutionally impermissible distinctions between similarly-situated street vendors. Plaintiffs contend that a bootblack stand would require less space than that permitted under D.C. vending regulations, and that a bootblack would create less litter and congestion than most other types of vendors.[5] Plaintiffs also argue that the District's present vending provisions, which contain a multitude of time, place, and manner restrictions, adequately protect the public from unreasonable interference caused by bootblack stands on public space. Plaintiffs assert that prohibiting this subclass of vendors from using public space is in no way rationally related to *any* legitimate government

purpose and fails to pass constitutional muster.

Secondly, and in the alternative, plaintiffs assert that this regulation, although facially neutral, is rooted in racial animus. Plaintiffs allege that at the time the prohibition was adopted in 1905 shoeshine stands in the District of Columbia were operated almost exclusively by blacks, and that this regulation is nothing more than a vestige of the Jim Crow era when laws were intentionally designed to thwart the economic self-sufficiency of blacks. In fact the post Civil War era is replete with examples of state and federal legislation sanctioned by the Supreme Court that was intended to disable the effects of the Civil Rights Act of 1871 and the Fourteenth Amendment. *See, e.g., Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). Plaintiffs suggest that evidence of pervasive racial discrimination, although circumstantial as to this particular regulation, raises the specter of invidious racial motivation. Plaintiffs' argument, despite its problems of proof, has a certain appeal and is not without merit. However, because we find that this regulation cannot withstand even the lowest Equal Protection scrutiny we find it unnecessary to reach the merits of plaintiffs' alternative ground.

## DISCUSSION

The main thrust of plaintiffs' attack is that this regulation is an irrational and discriminatory classification among similarly situated persons. On its face and in its

---

**3.** Subsection 112, which contains the challenged police regulation 112.4, appears in the general provisions chapter of Title 24 and is entitled *Retail Business Use of Adjoining Public Space.* All of the regulations in this subchapter *except* 112.4 relate to the use of sidewalks and public space outside of businesses or stores *by* the owners or occupiers of those stores.

**4.** Plaintiffs bring their Equal Protection challenges under the Fourteenth Amendment. *See* Plaintiffs' Motion for Preliminary Injunction at 12 n. 4. However, the Fourteenth Amendment is not applicable to suits against the District of Columbia. *Bulluck v. Washington,* 468 F.2d 1096, 1100 n. 9 (D.C.Cir.1972); *Service Employees Int'l Union v. District of Columbia,* 608 F.Supp. 1434, 1440 n. 7 (D.D.C.1985). Nonetheless, Equal Protection concepts are "inherent

in the due process of law guaranteed to citizens of the District by the fifth amendment." *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Therefore, for the purposes of this litigation against the District of Columbia, the court presumes that to the extent this regulation "would be barred by the equal protection clause if enacted by a state," it would also violate the "inherent" Equal Protection guarantees of the Fifth Amendment. *See Bulluck, supra.*

**5.** This court, based on personal observation as well as on many prosecutions of street vendors for selling counterfeit merchandise, *i.e.,* luggage, handbags, and t-shirts with false logos, is all too aware of the excessive congestion resulting from the extensive vending on public spaces in the area of 17th and K Streets and portions of Constitution Avenue.

context it is an economic regulation of a single type of local business. Once the constitutionality of an economic regulation is challenged, it is well settled that the fundamental constitutional principle a court must follow is that "all persons similarly situated" must be treated alike. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed. 2d 313 (1985). Our Equal Protection analysis need only focus on whether the classification is rationally related to a legitimate government purpose. In pursuing this analysis, we recognize that we are confronted at the outset with a vast body of precedent requiring that we give deference to the expressed objectives of the legislature. As a result, a court's review of a pure economic regulation has been called the "toothless rationality test," and has often amounted to little more than a rubber stamp to the legislation's purported objective. *See Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955) (holding that "[i]t is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it"). Adherence to this principle of deference is demonstrated by the fact that since 1937 most constitutional challenges to economic and social regulations have failed. *See Long Island Lighting Co. v. Cuomo*, 666 F.Supp. 370, 410 (N.D.N.Y.1987). It is not necessary to recite the litany of precedent upholding challenged legislation under the "rational basis" test. However, the once strictly delineated deference principle has experienced some anomalous applications. *City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam) demonstrates inconsistencies that are inherent in this standard of review and the difficulties a court could encounter if it strictly applied the principle to a challenged regulation. In a case involving a New Orleans vending ordinance that prohibited all push-cart food sales in the French Quarter, but exempted food vendors who had operated in the French Quarter for more than eight years, the Supreme Court, in upholding this regulation, stated:

When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions *presume* the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude.... In short, the judiciary *may not* sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.... (citations omitted) (emphasis supplied).

*Id.* at 303, 96 S.Ct. at 2516–17.

The Supreme Court, however, having restated the deference owed to the legislature's prerogative and the presumption of constitutionality did not rest. The Court found it necessary to go further and propose possible rationales for the challenged regulation. *Id.* at 304–06, 96 S.Ct. at 2517–18. Only after it was satisfied that the ordinance "could" be "rational" did the Supreme Court uphold the regulation as constitutional.

In the twelve years since this oft-quoted pronouncement was made, the Supreme Court and some lower courts have invalidated a number of statutes, regulations, and ordinances under a rational basis analysis. *See, e.g., City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Williams v. Vermont*, 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985); *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985); *Long Island Lighting Co. v. Cuomo*, 666 F.Supp. 370, 410 (N.D.N.Y.1987). *City of Cleburne*

is particularly instructive of the principle's flexibility. The Cleburne city council denied a special use permit for the operation of a group home for the mentally retarded. The Court of Appeals found that the mentally retarded were a "quasi-suspect" class and held that ordinance was facially invalid. The Supreme Court reversed, declining to extend to the mentally retarded "suspect" or "quasi-suspect" class protection and attendant heightened review. Instead, the Court found that although the State's goals were theoretically legitimate, its methods in achieving those goals were fatally flawed. Rather than accord the legislature's "classification" with the traditional degree of deference and the presumption of rationality, the Supreme Court held that a state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* 473 U.S. at 446, 105 S.Ct. at 3258. *Cleburne*, therefore, represents a departure from the extreme deference accorded legislative bodies in the past in that it appears to place at least some "burden of articulating a legitimate governmental interest ... on the party *defending* the classification." *See Long Island Lighting Co. v. Cuomo*, 666 F.Supp. 370, 421 (N.D.N.Y.1987). And although it is still a sound constitutional principle that legislatures, reflecting the wills of those who elected them, should enjoy a substantial degree of immunity from judicial interference, it is clear that a court would be shrinking from its most basic duty if it abstained from *both* an analysis of the legislation's *articulated* objective *and* the method that the legislature employed to achieve that objective.

Applying the two-part analysis of *Cleburne* and its progeny to the case at hand we have no difficulty finding that the bootblack prohibition fails to pass the rational basis test. This eighty-four year old regulation was adopted by a then three-member Board of Commissioners in 1905 along with a provision regulating, but not prohibiting, fruit stands in public areas.[6] Neither plaintiffs nor the District of Columbia have discovered any legislative history for the regulation other than a legal notice appearing in *The Washington Post* on June 29, 1905.[7] Although "legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent," *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969), the rational basis test requires that the justification posited by the legislature be *both* conceivable and rational. We have no way of divining the purpose of the Commissioners. The defendants speculate that banning bootblacks from use of public space in 1905 conceivably could have reduced litter or interference with the flow of pedestrian traffic. We have no proof of this. Moreover, the District has not articulated the belief that there is a continuing validity or life to this regulation in the present context.[8] Even if the court presumed that the regulation's hypothetical goal was "rational," the regulation would fail because the District's method for achieving this goal irrationally and arbitrarily singles out bootblacks as unique from other vendors and somehow critical to the achievement of this hypothetical goal. "As forgiving as the rational basis test is, it does not go that far." *New York State*

---

**6.** Fruit vendors are permitted in the District but are regulated under Title 24, Chapter 1 of the District's Municipal Regulations. *See* D.C.Mun. Reg., Title 24, §§ 112.1, 112.2 & 112.5.

**7.** Apparently, prior to this regulation's adoption the District of Columbia permitted bootblacks to operate on public space, but required them to obtain permits. *See Report of Commissioner of the District of Columbia* 34 (1899–1900).

**8.** The District states only that "by maintaining the regulation ..., the Council ... underscores

the purpose of this regulation ... [which is] to keep the public space free and clear and to regulate the types of vendors that may occupy that space." *See* Defendants' Motion for Summary Judgment at 8. This declaration alone does not afford the regulation the protective shroud of the legislative prerogative. There must be a contemporary rational connection between the desire "to regulate public vendors" or the need to keep public space "free and clear" and the total prohibition of a single class of vendors.

*Club Ass'n v. City of New York,* —— U.S. ——, 108 S.Ct. 2225, 2238, 101 L.Ed.2d 1 (1988) (Scalia, J., concurring in part). There must be at least some plausible connection between the "uniqueness" of a bootblack and the purpose of the law. *See id.* To find this connection, we would have to "strain our imagination" beyond that which is required under the rational basis test to justify prohibiting bootblacks from the use of public space while permitting access to virtually every other type of vendor. *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370, 421 (N.D.N.Y.1987). Even the minimal rational basis test does not require the court to muse endlessly about this regulation's conceivable objectives nor to "manufacture justifications" for its continued existence. *See Schlesinger v. Ballard,* 419 U.S. 498, 520, 95 S.Ct. 572, 584, 42 L.Ed.2d 610 (1975) (Brennan, J., dissenting). The inability of the District to articulate any rational basis for distinguishing bootblacks from other types of vendors combined with the regulation's elusive purpose compel us to declare this regulation unconstitutional.

An order consistent with the foregoing has been entered today.

## ORDER

Upon consideration of plaintiffs' Motion for Summary Judgment, defendants' opposition thereto, and the entire record herein, it is this 21st day of March 1989

ORDERED that District of Columbia Municipal Regulation Title 24, § 112.4 is declared unconstitutional, and it is

ORDERED that defendants are permanently enjoined from enforcing Section 112.4 and from prohibiting plaintiffs from shining shoes on the public streets, and it is

FURTHER ORDERED that defendants may prescribe such reasonable time, place, and manner restrictions on such activity as they deem necessary and proper.