UNIVERSAL LIFE CHURCH, a California non-profit corporation and J.P. Pace, Plaintiffs,

v.

The State of UTAH, a governmental entity; Michael Leavitt, Governor of the State of Utah; and Mark Shurtleff, Attorney General of the State of Utah, Defendants.

No. 2:01CV278K.

United States District Court, D. Utah, Central Division.

Jan. 17, 2002.

Brian M. Barnard, James L. Harris, Jr., Salt Lake City, UT, for Plaintiffs.

Edward O. Ogilvie, J. Mark Ward, Joel Ferre, Utah Attorney's Office, Salt Lake City, UT, for Defendants.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

This matter is before the court on (1) Defendants' Motion for Summary Judgment, (2) Plaintiffs' Motion for Summary Judgment, (3) Plaintiffs' Motion to Strike Affidavit of Gene Davis, (4) Plaintiffs' Motion to Strike Affidavit of Dan Larsen, (5) Plaintiffs' Motion to Strike Defendants' Exhibits C & D, (6) Defendants' Motion to Strike Portions of Universal Life Church Ministers' Affidavits, (7) Defendants' Motion to Strike Portions of Pace's Third Affidavit, (8) Defendants' Motion to Strike Portions of Hensely Affidavit, (9) Defendants' Motion to Strike Jury Demand, and (10) Plaintiffs' Motion for Judgment on the Pleadings Re: Affirmative Defenses. A hearing on the motions was held on October 18, 2001. At the hearing, Plaintiffs, Universal Life Church ("ULC") and J.P. Pace ("Pace"), were represented by Brian M. Barnard. Defendants, the State of Utah, Michael Leavitt, and Mark Shurtleff, were represented by Joel A. Ferre. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to these motions. Now being fully advised, the court renders the following Memorandum Decision and Order.

## I. CROSS–MOTIONS FOR SUMMARY JUDGMENT

### A. Background

This lawsuit is based on Senate Bill 211 (referred to herein as "SB 211," the "Challenged Statute," or the "Internet Statute"),

which the Utah Legislature passed during its 2001 legislative session. As codified, it provides:

**30–1–6.1. Ordination by Internet not valid.**

Certification, licensure, ordination, or any other endorsement received by a person through application over the Internet or by mail that purports to give that person religious authority is not valid for the purposes of Subsection 30–1–6(1)(a).

Utah Code Ann. § 30–1–6.1 (Supp.2001). The Challenged Statute supplements Utah Code Annotated § 30–1–6 (the "Marriage Solemnization Statute"), which provides:

**30–1–6. Who may solemnize marriages-Certificate.**

(1) Marriages may be solemnized by the following persons only:

(a) ministers, rabbis, or priests of any religious denomination who are:

(i) in regular communion with any religious society; and

(ii) 18 years of age or older;

(b) Native American spiritual advisors;

. . . . .

Utah Code Ann. § 30–1–6 (1998).

In addition, Utah law provides in pertinent part: "If any person not authorized solemnizes a marriage under pretense of having authority ... he shall be punished by imprisonment in the state prison not exceeding three years." Utah Code Ann. § 30–1–14 (1998).

The ULC is headquartered in Modesto, California. It has two tenets or beliefs: "the absolute right of freedom of religion," and (2) "to do that which is right." The ULC believes that each person has the right to do what is right for him or her so long as it does not infringe on the rights of others and is within the law.

The ULC will ordain anyone free, for life, without questions of faith. Anyone can be ordained a ULC minister in a matter of minutes by clicking onto the ULC's website and by providing a name, address, and e-mail address. Anyone can also be ordained by mailing to the ULC a name and address. There is no oath, ceremony, or particular form required. The ULC keeps records of ordinations, but does not keep membership records or records of church rites such as baptisms, weddings, or funerals. One can also order other products to aid in the ministry, including a minister's wallet credentials, blank press passes, a reversible MINISTER/PRESS windshield placard, the Ultimate Wedding Guide book and other clergy packages.

The ULC represents to its ministers that ULC ministers can perform rites and ceremonies, including weddings, and that they can ordain others into the ministry. The only limitation on ordinations is that a minister cannot ordain others without their permission. The ULC requires virtually nothing from its ministers: they are not required to perform any religious ceremonies, to oversee a congregation, to provide religious guidance or counseling, to report religious ceremonies to headquarters, to keep in contact with the ULC other than routine address changes, or to attend any worship services.

Pace was ordained a ULC minister in 1993 by application through the mail. He has had contact with the ULC through sporadic newsletters and reading of—but not participation in—"chat room" dialogue on the Internet. He has performed several marriage ceremonies in Utah as a ULC minister.

In their Complaint, Plaintiffs allege that the Challenged Statute violates Plaintiffs' rights to free exercise of religion, their rights to equal protection of the laws, and their substantive due process rights, all in violation of the United States and Utah Constitutions. The Complaint requests

declaratory relief, a preliminary and permanent injunction,[1] attorneys' fees, and costs.

In their Motion for Summary Judgment, Plaintiffs argue that the court should rule, as a matter of law, that the Challenged Statute violates the above-mentioned constitutional provisions, in addition to the Establishment Clause of the United States and Utah Constitutions. Defendants, on the other hand, contend that the court should rule as a matter of law that Plaintiffs do not have standing to challenge the Internet Statute, that Defendants are immune from suit, and that the Challenged Statute does not violate the United States Constitution.

### B. Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing the factual record, we construe all facts and make reasonable inferences in the light most favorable to the non-moving party. *See Byers v. City of Albuquerque,* 150 F.3d 1271, 1274 (10th Cir.1998).

### C. Discussion

#### 1. Standing

Defendants argue that Plaintiffs lack standing to challenge the constitutionality of the Internet Statute because Plaintiffs are not within the statute's zone of interest

and they have suffered no injury in fact. Defendants contend that the statute does not affect Plaintiffs because, regardless of the Challenged Statute, Plaintiffs cannot perform marriages in any event because they are not ministers, priests, or rabbis in "regular communion with any religious society," as required by the Marriage Solemnization Statute. Defendants concede that the Utah Legislature has not defined the above-quoted words, but Defendants offer common dictionary definitions to argue that Pace has never been in "regular communion with a religious society" and that the Legislature did not intend for a "minister" such as Pace to be allowed to perform marriage ceremonies. Accordingly, Defendants claim that only "ministers, priests, and rabbis in regular communion with any religious society" are affected by the Challenged Statute.

Defendants also argue that, because Plaintiffs do not fall within the zone of interest, Plaintiffs have not suffered, and cannot suffer, any injury in fact. According to Defendants, Plaintiffs have never been threatened with prosecution, and, as a practical matter, any prosecution of Plaintiffs would be as result of performing marriages without proper authority (i.e., as a minister not in regular communion with any religious society), rather than for violating the Challenged Statute. Thus, they argue, the Challenged Statute does not create a new or different crime. Defendants assert that, even if this court were to hold the Internet Statute unconstitutional, the question of whether or not a ULC minister could perform a valid marriage in Utah would still be in doubt because ULC ministers would still need to meet the re-

1. On April 24, 2001, this court entered a Temporary Restraining Order ("TRO"), enjoining Defendants from enforcing the Challenged Statute until further order of the court. On May 14, 2001, the court signed an Order to which Plaintiffs and Defendants had stipulated. The May 14 Order vacated the upcoming hearing on Plaintiffs' Motion for a Preliminary Injunction and continued the effect of the TRO until the court ruled on the parties' anticipated cross-motions for summary judgment.

quirements set forth in the Marriage Solemnization Statute. Thus, according to Defendants, this court lacks Article III authority to review the Challenged Statute.

In contrast, Plaintiffs argue that they need not await a criminal prosecution in order to have standing. They also argue that the Marriage Solemnization Statute does not define the phrase "in regular communion with any religious society," and no reported Utah case defines that phrase. Plaintiffs contend that Defendants have offered no legislative history or any other evidence to support their "restrictive meaning" of that phrase. Plaintiffs assert that, in the absence of ambiguity in the statute, it should be read and applied as written, and the words therein shall be given their common meaning. Plaintiffs have used the same dictionary as Defendants and have offered other meanings for the word "communion," which they claim encompasses the relationship between Pace and the ULC (i.e., communion is an act or instance of sharing). They point out that Defendants have no authority to support their assertion that "regular communion" must include watching over a congregation, having intimate fellowship with a group of members, providing religious leadership, providing religious guidance, and being selected by some special rite. Plaintiffs contend that Pace is "in regular communion" with the ULC because in his affidavit, he testifies that he is "in regular communion" with his church, and that if Pace and the ULC acknowledge a relationship that is comfortable and satisfactory to each of them and which they define as "regular communion," the discussion ends.

While this court is uncertain about whether Pace's occasional reading of news-

letters and chat-room dialogue satisfies the "regular communion" requirement set forth in the Marriage Solemnization Statute, the court need not rule on that issue because the court nonetheless finds that Plaintiffs have standing to contest the constitutionality of the Internet Statute.[2]

▮▮▮▮ Under Article III of the Constitution, a suit seeking declaratory relief is justiciable in federal court only when " 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Wilson v. Stocker,* 819 F.2d 943, 946 (10th Cir.1987) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). " 'The difference between an abstract question and a "case or controversy" is one of degree, of course, and is not discernible by any precise test.' " *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 297, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). A case or controversy "requires a plaintiff with a personal stake in the outcome sufficient to assure an adversarial presentation of the case." *Hardwick v. Bowers,* 760 F.2d 1202, 1204 (11th Cir.1985), *rev'd on other grounds,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). It is well settled that there are three elements of standing:

> First, the plaintiff must have suffered an 'injury in fact'-an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative,

**2.** Thus, the court's decision in this matter expresses no opinion on whether ULC ministers have authority under the Marriage So-

lemnization Statute to perform marriages in Utah, as that thorny issue is not before the court.

that the injury will be redressed by a favorable decision.

*Schaffer v. Clinton,* 240 F.3d 878, 882 (10th Cir.2001) (quotations omitted), *cert. denied,* —— U.S. ——, 122 S.Ct. 458, 151 L.Ed.2d 376 (2001); *see Glover River Org. v. United States Dep't of Interior,* 675 F.2d 251, 254 (10th Cir.1982). An injury in fact exists where a plaintiff has "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Phelps v. Hamilton,* 122 F.3d 1309, 1326 (10th Cir.1997). "A court can estimate the likelihood of prosecution by examining the identity and interests of each of the parties. The interest of the State in enforcing the statute, along with past enforcement patterns, provides one indication; the interest of the plaintiff in engaging in the prohibited activity provides another." *Hardwick,* 760 F.2d at 1205; *See International Society for Krishna Consciousness v. Eaves,* 601 F.2d 809, 818 (5th Cir.1979). Moreover, "[i]n some cases, the authentic interest of the plaintiff in engaging in the prohibited conduct can establish standing even though the only threat of enforcement by the State comes from the very existence of the statute." *Hardwick,* 760 F.2d at 1206; *see Babbitt,* 442 U.S. at 302–03, 99 S.Ct. 2301.

In *Babbitt,* the Supreme Court determined that a union could challenge a state law prohibiting deceptive advertising relating to farm products because the union planned to sponsor advertising campaigns in the future, and the State had not disavowed any intention of enforcing the statute. *Babbitt,* 442 U.S. at 302–03, 99 S.Ct. 2301. The Court determined that the union members had alleged that they had engaged in activities regulated by the statute, and it was "clear that [they] desired to engage in consumer publicity campaigns prohibited by the Act." *Id.* at 303, 99 S.Ct. 2301. The Court recognized that they

were "not without some reason in fearing prosecution for violation of the ban of specified forms of consumer publicity." *Id.* at 302, 99 S.Ct. 2301. Thus, "the positions of the parties are sufficiently adverse to present a case or controversy. . . ." *Id.* at 302–03, 99 S.Ct. 2301.

■ Thus, it is clear that a plaintiff "who shows that his fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative, and who challenges those specific provisions of state law which have provided the basis for threats of criminal prosecution against him, need not suffer actual arrest or prosecution to establish a case or controversy." *Wilson,* 819 F.2d at 946 (internal quotations and citations omitted); *see also United States v. Colorado Supreme Court,* 87 F.3d 1161, 1166 (10th Cir.1996) (recognizing that "[o]nce the gun has been cocked and aimed and the finger is on the trigger, it is not necessary to weight until the bullet strikes to invoke the Declaratory Judgment Act.").

■ The court finds that this case is one of those exceptional cases in which standing exists despite the lack of any actual or threatened prosecution of Plaintiffs. Pace has a personal stake in the outcome sufficient to assure an adversarial presentation of the case, and thus, a case or controversy exists. An "injury in fact" exists because Pace has "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Phelps,* 122 F.3d at 1326. Pace has announced his general desire to continue engaging in the very conduct that, under the Internet Statute, could subject him to imprisonment for up to three years. *See* Utah Code Ann. § 30–1–6 .1; Utah Code Ann. § 30–1–6(1)(a); Utah Code Ann. § 30–1–14. In Pace's view, performing marriage ceremonies is "an important religious practice," Second Aff. of J.P.

Pace at 4 ("Second Affidavit"), and a "fundamental rite," which is "essential, basic and integral to my role, function, and service as a minister." Third Aff. of Pl. J.P. Pace at 3. Moreover, Pace specifically stated in his Second Affidavit, dated June 27, 2001, that he intended to perform wedding ceremonies in August and September.[3] In addition, given the undisputed fact that one of the tenets of the ULC is to act within the law, see Pls' Resp. Mem. in Opp'n to Defs.' Mot. Summ. J. at v, coupled with the fact that Pace is also an attorney, Pace should not be required to violate the law and risk prosecution in order to seek a determination regarding whether he can continue a practice in which he has engaged for many years without fear of prosecution.

While this case has not been certified as a class action, the court recognizes that a judicial determination regarding the Challenged Statute will impact not only Pace, but also many of the more-than 5,600 ULC ministers in Utah, many of whom received their ordinations through application over the Internet or through the mail, as the affidavits provided by Plaintiffs point out.[4] Also, while the typical standing analysis looks solely to a plaintiff's personal stake in the judicial determination, the importance of a judicial determination regarding the constitutionality of the Internet Statute to people who intend to use ULC ministers for their marriage ceremonies is not lost on the court.[5]

While there have been no specific threats of prosecution against Plaintiffs, none would be expected in light of the court's injunction regarding the enforcement of the Challenged Statute, which has never been in effect. Thus, the lack of prosecutions or threats thereof carries little weight. Moreover, the fact that the Utah Legislature recently passed the Challenged Statute after years-if not decades-of tacitly allowing ULC ministers to perform marriage ceremonies, leads the court to conclude that enforcement of the newly enacted statute was likely contemplated.[6] This is particularly true because the Challenged Statute appears to directly target the ULC and its ministers. Moreover, the State has not disavowed its inten-

---

3. At that point, Pace could not have known whether the court's injunction against enforcement of the Challenged Statute would still be effective.

4. Defendants have moved to strike portions of the affidavits of other ministers, but the court has not relied on any of the allegedly objectionable testimony contained in the affidavits.

5. The validity of marriages performed by ULC ministers could be called into question if no judicial determination is made regarding the constitutionality of the Internet Statute. The court recognizes that a marriage will not be invalid if it was "consummated in the belief of the parties or either of them that [the person solemnizing their marriage] had authority and that they have been lawfully married." Utah Code Ann. § 30–1–5(1) (1998). With the constitutionality of the Challenged Statute now having been called into question, however, it is foreseeable that individuals will continue to use ULC ministers to solemnize their marriages. At the same time, without a judi-

cial determination, and in light of the media attention given to this case, these individuals may face a more difficult burden in establishing that they believed that the ULC minister had authority to marry them, casting a cloud over the validity of such marriages.

6. The ULC has had a presence in Utah since approximately 1976, and Defendants have provided testimony that the Salt Lake County Clerk's Office has never referred anyone to the Salt Lake District Attorney's Office for investigation or prosecution for performing invalid marriages under the Marriage Solemnization Statute. Mem. Supp. Defs.' Mot. Summ. J. at ix, Statement of Fact 28. Thus, the undisputed facts demonstrate that Pace and other ULC ministers have performed marriages in Utah for years without fear of prosecution and with the belief that they have been authorized to perform marriages under the Marriage Solemnization Statute.

tion to enforce the Challenged Statute. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302–03, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979).

Thus, this court finds that Plaintiffs have standing to challenge the Internet Statute because Plaintiffs have alleged a desire and an intent to engage in a course of conduct arguably affected with a constitutional interest but proscribed by statute, there is a causal relationship between the threatened injury and the challenged conduct, and there is a likelihood that the injury would be redressed by a favorable decision.[7]

### 2. Defendants' Immunity Defenses

■■■■ Defendants next claim that they are immune from suit. An action may be brought in federal court against state officials so long as only prospective injunctive relief is sought regarding an alleged constitutional violation. *See Ex parte Young*, 209 U.S. 123, 155–59, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Defendants, however, claim that the *Ex parte Young* exception does not apply in this case because Plaintiffs must show a close actual nexus between the state official and the immediate enforcement of a state law against Plaintiffs and that the officers charged are threatening to exercise that duty. Defendants argue that no one has been prosecuted for lacking the authority to perform marriages under the Marriage Solemniza-

tion Statute, let alone under the Challenged Statute. They also claim that the Governor and the Attorney General of Utah (the "Individual Defendants") do not even have enforcement responsibility for the Challenged Statute; rather, they claim that enforcement would be left to local and district attorneys.[8]

The court finds that the Individual Defendants are not immune under the *Ex parte Young* exception. *See id.; Cooper v. State of Utah*, 684 F.Supp. 1060, 1066 (D.Utah 1987). This action seeks prospective injunctive relief, and the state officials named-the Governor and the Attorney General—are proper defendants in this action. *See Cooper*, 684 F.Supp. at 1067; *Parker v. Rampton*, 28 Utah 2d 36, 497 P.2d 848, 853 (1972).

### 3. Constitutional Challenges

#### a. The Free Exercise Clause

Plaintiffs argue that the State must pursue a course of "neutrality" toward religion, favoring neither one religion over others nor religious adherents collectively over non-adherents, citing *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 792–93, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). Plaintiffs assert that declaring an act of ordination ineffectual because a church chooses to use the Internet or the mail is an unconstitutional interference with the internal opera-

---

7. While the court has ruled that the injury likely would be redressed by a favorable decision, that conclusion pertains only to the potential injury posed by the Challenged Statute, as compared to the status quo-no prosecutions-prior to the enactment of the Internet Statute. As mentioned above, the court expresses no opinion on whether the State may or may not prosecute ULC ministers under the Marriage Solemnization Statute.

8. Defendants also claim that the Individual Defendants are absolutely immune from suit insofar as Plaintiffs sued them in their person-

al capacities. The court need not address this argument in light of its finding that they are not immune from suit in their official capacities.

In addition, Defendants argue that the State is immune from suit. Plaintiffs appear to concede that the State is immune, arguing that they never served the Complaint on the State. To the extent that any ambiguity remains about whether the State is a party to this action, the claims against the State are dismissed.

tions of a church. They contend that the Internet Statute takes from churches the ability to decide how to empower a cleric within their religion and that such minute government management of the operations of a church is excessive entanglement.[9]

■■■ The court finds that the Challenged Statute does not unconstitutionally infringe on Plaintiffs' right to freely exercise their religion. The First Amendment applies to the States through the Fourteenth Amendment, *see Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), and provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof.* ..." (Emphasis added). The Free Exercise Clause protects beliefs that are religious and sincerely held. *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 713–19, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (stating that the free exercise inquiry asks whether government has placed a "substantial burden on the observation of a central religious belief or practice"). Ascertaining the sincerity of a belief generally involves assessing whether an activity is the good faith observance of religious belief. *See International Soc'y of Krishna Consciousness v. Barber,* 650 F.2d 430, 438–41 (2nd Cir. 1981). The goal, of course, is "to protect only those beliefs which are held as a matter of conscience." *Id.* at 441.

■■■ Nowhere have Plaintiffs demonstrated that being ordained through application over the Internet or through the mail is a religious belief, much less that it is sincerely held. Rather, the Internet and mail application procedures for becoming a minister is merely an administrative convenience to the ULC. Notably, the ULC does not *require* that its ministers be ordained through application through the mail or over the Internet. Indeed, individuals may apply for ordination over the telephone, in person by any other ULC minister, or even by fax. The Challenged Statute does not dictate or control whom the ULC may choose to ordain-it may still ordain whomever it wishes. Moreover, the ULC is not prohibited from ordaining its ministers who send their applications through the Internet or by mail; however, those individuals would not have authority to solemnize marriages in Utah.[10] In addition, the Challenged Statute does not force Plaintiffs to do anything contrary to their beliefs. *See Swanson v. Guthrie Indep. Sch. Dist. No. I–L,* 135 F.3d 694 (10th Cir.1998).

Thus, the Internet Statute applies to a secular activity that the State clearly has the power to regulate. (*Zablocki v. Redhail,* 434 U.S. 374, 399, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978)); *United States v. Seay,* 718 F.2d 1279 (4th Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2677, 81 L.Ed.2d 873 (1984); *see also Maynard v. Hill,* 125 U.S. 190, 205, 8 S.Ct. 723, 31 L.Ed. 654 (1888). It does not violate

9. Plaintiffs also contend that, for the same reasons that the Challenged Statute violates the free exercise clause of the First Amendment to the United States Constitution, it violates the free exercise of religion protected by the Utah Constitution, Article I, § 4.

10. Indeed, the burden on the ULC is quite minimal when one considers that the Challenged Statute does not pertain to ULC ministers who download the minister application form from the Internet and then fax the completed form to the ULC or telephone the ULC with the required information (i.e., a name and address). Moreover, a close reading of the Challenged Statute does not invalidate the authority of ministers who receive their ordination certificates and other pertinent materials over the Internet, so long as their applications are received by methods other than over the Internet or through the mail.

Plaintiffs' free exercise rights under the First Amendment of the United States Constitution or under Article I, Section 4 of the Utah Constitution.[11]

### b. The Due Process Clause

Plaintiffs argue that the Challenged Statute violates their substantive due process rights protected by the United States Constitution.[12] They argue that they have a fundamental liberty and/or property interest in the right to practice their religion (i.e., to perform marriage ceremonies) and to conduct the internal workings of their church, and thus, the Challenged Statute must be scrutinized under a "strict scrutiny" standard. Additionally, they claim that the Challenged Statute is so unfair, capricious, arbitrary, and irrational as to violate substantive due process.[13]

■■■■■■ The Fourteenth Amendment protects citizens from the deprivation of life, liberty, or property, without due process of law. U.S. Const. amend. XIV, § 1. This court has already ruled that the Challenged Statute does not interfere with Plaintiffs' rights to freely practice their

religion, and this court finds that there is no constitutionally protectable liberty or property interest in performing marriage ceremonies. Thus, because there is no fundamental liberty or property interest at stake, the Challenged Statute must pass only a deferential rational relationship test. *Oklahoma Educ. Ass'n v. Alcoholic Beverage Laws Enforcement Comm'n*, 889 F.2d 929, 935 (10th Cir.1989). In *Oklahoma Education Association*, the Tenth Circuit noted that

> When local economic or social regulation is challenged as violating substantive due process, courts consistently defer to legislative determinations as to the desirability of particular statutory schemes. Unless a state law trammels fundamental personal rights, we are to presume that state legislatures have acted within their constitutional power and are to require only that the law bears a reasonable relation to the state's legitimate purpose.

*Id.* at 935 (internal quotations omitted). If "any conceivable legitimate governmental interest" supports the contested statute, it

---

**11.** In their motion, Plaintiffs also seek a declaration that the Challenged Statute violates the Establishment Clause of the United States Constitution (and presumably-although not specifically mentioned-the Utah Constitution). Plaintiffs, however, never raised these claims in their Complaint. Even if Plaintiffs' Complaint could be read to assert Establishment Clause claims, such claims would fail. A legislative enactment does not violate the Establishment Clause so long as it (1) has a secular legislative purpose, (2) does not have the principle or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive governmental entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Wells v. City and County of Denver*, 257 F.3d 1132, 1152 (10th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 469, 151 L.Ed.2d 384 (2001). The court finds that the Challenged Statute fails on each prong of the *Lemon* Test, as Plaintiffs have offered no evidence that it has no secular purpose, "there is

no evidence that its principal or primary effect either advances or inhibits religion," and it does not foster an excessive government entanglement with religion.

**12.** Plaintiffs also argue that the Challenged Statute violates their substantive due process rights protected by the Utah Constitution for the same reasons it violates the United States Constitution.

**13.** Plaintiffs' "arbitrary and capricious" argument is based on the distinction between ULC ministers whose ordinations were received through application over the Internet or by mail and those whose ordinations were received through application by some other method. This argument, however, is not an argument that the Challenged Statute violates their substantive due process rights. This argument is more properly analyzed under an equal protection analysis and thus will be addressed below.

"is not 'arbitrary and capricious' and cannot offend substantive due process norms." *Sam & Ali, Inc. v. Ohio Dep't of Liquor Control*, 158 F.3d 397, 402 (6th Cir.1998).

 While no legislative history is available regarding the purpose of the Challenged Statute, it is conceivable that it bears a rational relation to the State's legitimate purpose of protecting the integrity of marriages. It is clear that states have an absolute right to prescribe the condition upon which marriage shall be created. (*Zablocki v. Redhail*, 434 U.S. 374, 399, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978)); *United States v. Seay*, 718 F.2d 1279 (4th Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2677, 81 L.Ed.2d 873 (1984); *see also Maynard v. Hill*, 125 U.S. 190, 205, 8 S.Ct. 723, 31 L.Ed. 654 (1888) (stating that "marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature."). Indeed, "marriage is a state-conferred legal status, the existence of which gives rise to the rights and benefits reserved exclusively to that particular relationship." *Baehr v. Lewin*, 74 Haw. 530, 852 P.2d 44, 58 (1993). The power to regulate the marriage relation "includes the power to determine the requisites of a valid marriage contract and to control the qualifications of the contracting parties, the forms and procedures necessary to solemnize the marriage, the duties and obligations it creates, its effect upon property and other rights, and the grounds for marital dissolution". *Id.; Salisbury v. List*, 501 F.Supp. 105, 107 (D.Nev.1980); *O'Neill v. Dent*, 364 F.Supp. 565 (E.D.N.Y.

1973). Accordingly, " '[r]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed.' " *Moran v. Moran*, 188 Ariz. 139, 933 P.2d 1207, 1212 (1996) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 386, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978)).

 In seeking to protect the integrity of marriage, the Legislature presumably sought to supplement the already-existing Marriage Solemnization Statute by making it clear that individuals who so effortlessly and casually become ministers, priests, or rabbis (i.e., by applying to become a minister, priest, or rabbi by submitting their names and addresses over the Internet or through the mail), cannot solemnize a marriage in Utah. Conceivably, the Legislature was concerned that one who so cavalierly becomes a minister might not appreciate the gravity of solemnizing a marriage and might not bring to the ceremony the desired level of dignity and integrity.[14] In addition, it is conceivable that the Legislature could rationally be concerned that an individual's decision to use such a minister might be reflective of a cavalier attitude toward the marriage relationship.[15] It is not the court's role to agree or disagree with the Legislature's methods for achieving its goals; rather, this court is obligated to find the Challenged Statute constitutional unless there is no conceivable rational relationship between the Challenged Statute and the State's interest. Because the Statute is rationally related to the legitimate state interest of protecting the integrity of marriages, this court finds that Plaintiffs' substantive due process claims,

14. For example, at the hearing on this matter, counsel for Defendants indicated that there had been a growing problem of individuals ordaining their pets as ULC ministers.

15. The court recognizes that this fear is not borne out by Pace's affidavits concerning the amount of time he spends with couples for whom he intends to perform a marriage ceremony and the thought and preparation that goes into his ceremonies. However, that information is not relevant to the court's analysis.

under both the United States and Utah Constitutions, are without merit.

### c. The Equal Protection Clause

 Plaintiffs claim that the statute violates the Equal Protection Clause because it implicitly allows Native American spiritual advisors to receive ordination over the Internet or by mail while prohibiting certain other ecclesiastics from so receiving their ordination. They claim that, because the right to marry is a fundamental right, strict scrutiny is required, and the Internet Statute does not pass the strict scrutiny test. Plaintiffs contend that no justification is articulated by the state for protecting Native American religious leaders but excluding ULC ministers.[16]

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The fundamental guarantee of the Equal Protection Clause is that " 'all persons similarly situated should be treated alike.' " *Thompson v. Colorado*, 258 F.3d 1241, 1251 (10th Cir.2001) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). This court has ruled that no "fundamental right" is involved in this case. It is not about the right to marry, which is clearly a fundamental right protected by the Constitution, *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Zablocki v. Redhail*, 434 U.S. 374, 386, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). Rather, it is about the right to perform marriage ceremonies. In addition, Plaintiffs do not-and could not-argue that they are a suspect or quasi-suspect class triggering a

level of scrutiny more searching than a rational relationship test.

 Because the Challenged Statute does not make classifications based upon a fundamental right or a suspect class, the statute must pass only a rational relationship test. *See Curley v. Perry*, 246 F.3d 1278, 1285 (10th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 274, 151 L.Ed.2d 201 (2001). Under the rational relationship test, Plaintiffs have the "heavy burden of proving that 'the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.' " *Oklahoma Educ. Ass'n v. Alcoholic Beverage Laws Enforcement Comm'n*, 889 F.2d 929, 933 (10th Cir.1989) (quoting *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988)); *United States v. Lee*, 957 F.2d 778, 782 (10th Cir.1992) ("The Supreme Court has made it clear that statutory classifications will be set aside as violative of equal protection only if no grounds can be conceived to justify them as rationally related to a legitimate state interest."). Also, "[i]t is well settled that economic and social legislation generally is presumed valid." *Oklahoma Education Ass'n*, 889 F.2d at 932. A court will not "invalidate a statute because the legislature has not fashioned the classification in question with 'mathematical nicety.' " *Id.* at 934 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)). Further, "[t]he Constitution does not prohibit the legislature from focusing on only part of a problem: 'the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legisla-

---

**16.** Again, Plaintiffs also claim that the challenged statute violates their equal protection rights guaranteed by the Utah Constitution, Article I, § 24. Plaintiffs assert that Utah

courts have routinely applied federal case law and have applied an analysis identical to that found in federal equal protection cases.

tive mind.'" *Id.* (quoting *Williamson v. Lee Optical,* 348 U.S. 483, 489, 75 S.Ct. 461 (1955)). It is not the role of this court to "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam).

In this case, the Challenged Statute passes constitutional muster regarding the classifications created between Plaintiffs and Native American spiritual advisors. There is no suggestion that Native American spiritual advisors achieve that status by merely sending their name and address over the Internet or through the mail, and thus the Legislature rationally concluded that there was no reason to make the Challenged Statute applicable to Native American spiritual advisors.

▮ As noted above, however, another classification has been created by the Challenged Statute: (1) ministers whose applications were received over the Internet or through the mail, and (2) ministers whose applications were received via fax, telephone, or in person by another ULC minister.[17] The Challenged Statute invalidates the authority of the individuals in the former group to perform marriages in Utah without risking prosecution, while it does not invalidate the authority of those in the latter group.[18]

With all due respect to the Utah Legislature, this court cannot conceive of any ground upon which such classifications could be rationally related to the State's interest in protecting the integrity of marriages. A state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). If the Legislature was concerned with the casual and effortless manner in which an individual is able to become a ULC minister, there is no rational basis for the differential treatment between (1) ministers who applied via the Internet and mail, and (2) those who applied via fax, telephone, or in person.

The same information-a name and address-is all that is required to become a minister in the ULC, regardless of the manner in which such information is received. It is not disputed that ULC ministers are permitted to submit applications for ordination in methods other than over the Internet or in the mail. Indeed, it is clear that a ULC minister can ordain-in person-any individual who seeks to be ordained, and even the ULC web site provides a telephone number and a fax number for the ULC.

Consequently, there is no plausible connection between the "uniqueness" of the ministers who applied for ordination via the Internet and mail and the purpose of

---

17. Plaintiffs also argue that ministers whose applications are received by Federal Express or UPS are treated differently than those whose applications are received through the mail or over the Internet. This court makes no determination regarding whether the term "mail" in the Challenged Statute includes or excludes Federal Express, UPS, or any other private delivery service.

18. While the court has not ruled that these individuals have authority in any event under

the Marriage Solemnization Statute, the fact that the Defendants themselves have highlighted that no ULC minister has ever been prosecuted-or even threatened with prosecution-for lacking the authority to perform a marriage under that Statute creates a presumption that, without being covered by the Challenged Statute, ULC ministers could continue, as they have been, to solemnize marriages without fear of prosecution.

the Internet Statute. *See Brown v. Barry,* 710 F.Supp. 352, 356 (D.D.C.1989). The Legislature has relied on a classification whose relationship to a goal is so attenuated as to render the distinction arbitrary and irrational. *See City of Cleburne,* 473 U.S. at 446, 105 S.Ct. 3249. Accordingly, Plaintiffs have not been accorded equal treatment to those who are virtually identically situated, thus depriving Plaintiffs of their equal protection rights under both the United States and Utah Constitutions.

## II. PLAINTIFFS' MOTION TO STRIKE AFFIDAVIT OF GENE DAVIS

The Court has not relied on the testimony of Gene Davis, the sponsor of SB211, and thus, Plaintiffs' motion is moot.

## III. PLAINTIFFS' MOTION TO STRIKE AFFIDAVIT OF DAN LARSEN

Dan Larsen of the Attorney General's office applied to become a ULC minister and has provided an affidavit about the information he provided and the materials he received from the ULC. Plaintiffs claim that the affidavit is hearsay and that his characterization, understanding, and interpretations of the practices and beliefs of the ULC are immaterial and irrelevant.

This motion is moot, because, as Plaintiffs contend, the ULC web site speaks for itself, and the court has not relied on any other information provided by Mr. Larsen.

## IV. PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' EXHIBITS C & D

Defendants have attached various corporate documents relating to the Universal Life Church. Plaintiffs claim that the exhibits relate to an entity known as the Universal Life Church of Utah, a corporation-not the non-profit entity who is a Plaintiff in this lawsuit. The Court has

not relied on these documents, and thus the motion is moot.

## V. DEFENDANTS' MOTION TO STRIKE PORTIONS OF ULC MINISTERS' AFFIDAVITS

Defendants have moved to strike portions of affidavits of J.P. Pace, Andre Hensely, Miriam Dunford, L. Cameron Mosher, Thomas J. Tobias, Jr., and Hillary Raleigh because they contain hearsay, legal opinions or conclusions, statements not made on personal knowledge and statements that are conclusory or irrelevant.

The Court has not relied on any hearsay, legal opinions or conclusions, statements not made on personal knowledge, or conclusory statements contained in the above-mentioned affidavits. Thus, this is motion is moot.

## VI. DEFENDANTS' MOTIONS TO STRIKE PORTIONS OF PACE'S THIRD AFFIDAVIT

Defendants have moved to strike Pace's affidavit, which contains information about his belief that he is in "regular communion" with his church. They claim that it contradicts his deposition testimony and is full of legal conclusions. They claim that, in his deposition, he admitted that he had no regular communion with his church. His affidavit attempts to contradict this. Because this court does not rule on whether Pace is in "regular communion" with the ULC, Defendants' motion is moot.

## VII. DEFENDANTS' MOTION TO STRIKE PORTIONS OF HENSLEY AFFIDAVIT

Defendants seek to strike portions of Hensley's second and third affidavits because they contain legal opinions, conclusory statements, and statements that lack foundation. Again, the court has not relied on the problematic legal conclusions

and conclusory statements contained in Hensley's affidavit, and thus, Defendants' motion is moot.

## VIII. PLAINTIFFS' MOTION TO STRIKE JURY DEMAND

In light of the Court's rulings, this motion is moot.

## IX. PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS REGARDING AFFIRMATIVE DEFENSES

In light of the Court's rulings, this motion is moot.

## X. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that: (1) Defendants' Motion for Summary Judgment [document # 34] is DENIED. The court finds that the Challenged Statute is unconstitutional in that it violates Plaintiffs' equal protection rights under the United States and Utah Constitutions. Defendants are permanently enjoined from enforcing the Challenged Statute. (2) Plaintiffs' Motion for Summary Judgment [document # 36] is GRANTED on equal protection grounds; (3) Plaintiffs' Motion to Strike Affidavit of Gene Davis [document # 40] is MOOT; (4) Plaintiffs' Motion to Strike Affidavit of Dan Larsen [document # 42] is MOOT; (5) Plaintiffs' Motion to Strike Defendants' Exhibits C & D [document # 44] is MOOT; (6) Defendants' Motion to Strike Portions of ULC Ministers' Affidavits [document # 49] is MOOT; (7) Defendants' Motion to Strike Portions of Pace's Third Affidavit [document # 56] is MOOT; (8) Defendants' Motion to Strike Portions of Hensely Affidavits [document # 68] is MOOT; (9) Defendants' Motion to Strike Jury Demand [document # 16] is MOOT; and (10) Plaintiffs' Motion for Judgment on the Pleadings Re: Affirmative Defenses [document # 17] is MOOT. The Clerk of the Court is directed to enter judgment for Plaintiffs. Plaintiffs are entitled to reasonable attorneys fees and costs, which will be determined at a later date pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and Rule 54(d) of the Federal Rules of Civil Procedure.